# EXHIBIT 1



## MASTER SERVICES AGREEMENT

This Master Services Agreement ("**Agreement**") is entered into as of October 1, 2013 ("**Effective Date**"), by and between Blackhawk Network, Inc. ("**Blackhawk**") located at 5918 Stoneridge Mall Road, Pleasanton, CA 94588 and Continental Logistics Solutions, Inc.("**Company**") located at 11697 West grand Avenue, Northlake, IL 60164. For the purposes of this Agreement, Blackhawk shall mean Blackhawk Network, Inc. and its affiliates and subsidiaries.

**1. Services.** Company shall provide certain services ("*Services*") and deliver certain related deliverables ("*Deliverables*") in accordance with the terms of this Agreement and the applicable Statement of Work ("*SOW*"), substantially in the form that is attached herein as Exhibit A, whether or not any or all of the acts, services, tasks, subtasks, deliverables and/or work are expressly identified in the applicable SOW. No performance or partial performance of Services shall be deemed complete unless such Services comply with the warranties set forth in Section 10 below. Company shall keep Blackhawk advised of Company's progress related to Services and Deliverables. Company shall prepare and deliver written reports with respect thereto as requested by Blackhawk or as set forth in the applicable SOW.

**2. Change Orders**. Blackhawk may desire to have Company make significant custom modifications to the Services that were not contemplated by the parties when the SOW was created. If so, Blackhawk will submit a written change order to Company, describing such changes in appropriate detail (**"*Change Order*"**). If a Change Order does not require Company to incur any additional material costs or expenses, then it will make such modification within ten (10) business days of its receipt of Blackhawk's Change Order. If a Change Order does require that Company incur additional material costs or expenses, then Company in good faith will provide Blackhawk with a written, non-binding assessment of such costs and expenses and the time required to perform such modifications, within ten (10) business days of its receipt of Blackhawk's Change Order. Blackhawk will notify Company in writing within ten (10) days after receipt of any itemized statement from Company as to whether Blackhawk wishes Company to

implement such Change Order based on Company's statement. Blackhawk will compensate Company for implementation of a Change Order in accordance with the terms and conditions of the relevant Change Order and Company's statement, as provided to Blackhawk prior to Company's implementation of the Change Order, if any.

**3. Representatives and Personnel**.

    **3.1 *Representatives.*** Each party will designate a representative in the applicable SOW for the purposes of sending and receiving communications, including without limitation, instructions, approvals, submissions, business-related notices, or any other communications or transactions between the parties ("*Representative*").

    **3.2 *Personnel.*** Company shall engage its employees and/or third-party consultants (collectively or individually referred to as the "*Personnel*") to perform the Services. Notwithstanding the foregoing, if Company delegates the performance of its obligations hereunder to a third party consultant or subcontractor it may do so only upon the prior written consent of Blackhawk. Company, its third-party consultants, and subcontractor(s) shall be jointly and severally liable for the breach of any of the terms of this Agreement and for the acts and omissions of each other.

    **3.3 *Key Personnel.*** Company shall not remove any key Personnel engaged in performing Services, without first notifying Blackhawk in writing. Company shall replace the key Personnel with Personnel having equal skills and qualifications within ten (10) days of such removal.

    **3.4 *Removal of Personnel.*** Blackhawk may request removal and/or replacement of any Personnel engaged in performing Services if, in Blackhawk's judgment, such Personnel fails to conduct themselves in a businesslike manner or fails to provide Services in a manner that conforms to the terms of this Agreement or with the highest professional standards of one skilled in the industry. Upon receipt of such request, Company shall replace any such Personnel with substitute Personnel with appropriate skills and qualifications.

**3.5    Access by Personnel.** Personnel will be granted access to Blackhawk facilities subject to compliance with Blackhawk's standard administrative and security requirements and policies, for the sole purpose of performing the Services. Access to Blackhawk facilities shall be restricted to normal Blackhawk business hours. Access to Blackhawk facilities outside normal business hours must be approved in advance by Blackhawk Representative. While present at Blackhawk facilities, Personnel shall be accompanied by Blackhawk personnel, unless otherwise specified prior to such event by Blackhawk Representative or his or her designee. All Personnel shall carry and produce when requested a valid Company identification card. Company shall not in any way physically alter or improve any Blackhawk facility without the prior written approval of Blackhawk. While at any Blackhawk facility, Personnel shall (1) comply with Blackhawk's requests, rules, policies, and regulations regarding personal and professional conduct (including without limitation, the wearing of a particular uniform, identification badge, or personal protective equipment and adhering to regulations and general safety practices or procedures) and (2) otherwise conduct themselves in a businesslike manner.

**4.    Independent Contractor Status.** Parties agree that Company and its Personnel are independent Contractors and not employees, agents, joint venturers or partners of Blackhawk. Nothing in this Agreement shall be interpreted or construed as creating the relationship of employer and employee between Blackhawk and Company and/or its Personnel. The parties acknowledge that neither Company nor its Personnel are Blackhawk employees for state or federal tax or labor and employment law purposes or any other purpose. Company and its Personnel shall retain the right to perform services for others during the term of this Agreement and Blackhawk reserves the right to obtain services of a similar or identical nature from any other person or entity. Company shall be solely responsible for any remuneration or benefits Company owes its Personnel for the Services and Deliverables provided under this Agreement, and complying with all state and federal wage and hour obligations. Parties agree that Blackhawk review or approval of hours worked for purposes of paying Company hereunder shall not be deemed a review, approval or direction of hours for which Company will pay its Personnel. Company acknowledges that neither Company nor its Personnel shall be eligible to enroll for and/or receive benefits under any Blackhawk employee benefit plan maintained by Blackhawk including without limitation vacation, bonus, any employee pension benefit plan, any employee welfare benefit plan, or any stock option or stock purchase plan, and that the foregoing shall apply to Company (and its Personnel) even if Company (or any of its Personnel) is subsequently reclassified by any court or governmental agency as a common-law employee for periods during which Services were performed under this Agreement.

**5.    Acceptance.**

**5.1    Acceptance Criteria.** Services shall be subject to acceptance testing by Blackhawk to verify that they satisfy the acceptance criteria mutually agreed to by the parties ("*Acceptance Criteria*"), as developed in accordance with the applicable SOW. Such Acceptance Criteria shall be based, at a minimum, on conformance of the Services to the specifications set forth in the applicable SOW. In the event the parties fail to agree upon Acceptance Criteria, the acceptability of the Services shall be based solely on Blackhawk's reasonable satisfaction therewith.

**5.2    Acceptance Testing.** When Company notifies Blackhawk that it has completed a Service, or a milestone (if any), Blackhawk will test or evaluate the related Services to determine whether such Services comply in all material respects with the Acceptance Criteria. Upon completion of review and testing, Blackhawk shall promptly notify Company whether it has accepted such Services ("*Accept*" or "*Acceptance*"), or whether it has identified discrepancies with the Acceptance Criteria ("*Reject*"). Blackhawk may Accept or Reject the entire or a component of the Services in its sole discretion. If Blackhawk Rejects a Service, Blackhawk shall provide a written list of items that must be corrected. On receipt of Blackhawk's notice, Company shall immediately commence all reasonable efforts to complete, as quickly as possible, such necessary corrections, repairs and modifications to the Services as will permit them to be ready for re-testing and review, but in no event shall such corrective measures exceed twenty (20) days. The testing and evaluation process shall resume, as set forth above.

**5.3    Acceptance Notice.** If Blackhawk Accepts the Services, it shall issue a written "*Acceptance Notice*". The date of such Acceptance Notice shall be deemed the "*Acceptance Date*". If Blackhawk determines that the Services, as revised, still do not comply in all material respects with the Acceptance Criteria, Blackhawk may either (1) afford Company the opportunity to repeat the correction and modification process as set forth above, or (2) depending on the nature and extent of the failure in Blackhawk's sole judgment, terminate this Agreement and/or the applicable SOW in accordance with Section 15 (Term and Termination) as a non-curable default with respect to (i) the Services that are not performing or conforming as required herein, or (ii) if the failure materially affects the function or desirability of the Services to Blackhawk as a whole, the entire Agreement. The foregoing correction and modification procedure shall be repeated until the Services, based on Blackhawk's good faith determination, passes the applicable Acceptance Criteria, or Blackhawk elects one of the termination options described above.

**6.    Payment for Services.**

**6.1    Payment Terms.** In consideration for the timely and fully satisfactory performance of the Services, Blackhawk agrees to pay Company the amount specified in undisputed invoice(s) in the manner specified in the applicable SOW. All milestone payments, if any, specified in the applicable SOW shall be credited against and deducted from the total amount due to Company. Company shall share with Blackhawk any and all discounts, rebates, bonuses, incentives and/or commissions received from its suppliers, vendors or contractors in connection with performing the Services to Blackhawk or apply such toward the amounts due to Company, as directed by Blackhawk.

**6.2    Payment Schedule.** Provided that Company is not in material breach of this Agreement and/or an SOW, the undisputed amounts due to Company will be paid within thirty (30) days after Blackhawk's receipt of Company's invoice except as may be otherwise specified in the applicable SOW. Company shall submit its invoices in accordance with Exhibit B and as follows: (a) where an SOW provides for hourly rates, Company shall submit its invoice(s) not less frequently than monthly; (b) where a SOW provides for payment upon (i) completion of the Services, Company shall submit an invoice for the total amount within thirty

(30) days after the completion of Services, or (ii) completion of each milestone, Company shall submit the applicable invoice within thirty (30) days after the milestone completion date. Company's invoice shall include details such as hourly rates, number of hours performed, deliverables provided, etc., and Company shall provide any and all supplementary documentation to substantiate the amount charged, as Blackhawk may request.

**6.3    Costs and Expenses.** Except for any actual out-of-pocket net expenses specified in the applicable SOW ("*Reimbursable Expenses*"), Company shall be responsible for all costs and expenses incidental to the performance of Services. Blackhawk shall not be obligated to pay any amounts to Company for Reimbursable Expenses unless such expenses are specified in the applicable SOW and Company supplies reasonable supporting documentation in substantiation of such costs (e.g., copies of unaltered third-party invoices). Except as expressly stated in the applicable SOW, Company shall be solely responsible for payment of all costs of equipment provided by Company and all applicable sales, use, or other taxes assessed against or associated with the Services or any other service authorized by Blackhawk under this Agreement.

**6.4    Travel Expenses.** Blackhawk will reimburse Company for travel costs reasonably incurred by Company in connection with the Services only if Blackhawk has agreed to such expenses in writing in the applicable SOW, prior to such expenses being incurred and only if Company submits valid receipts, ledgers, and other records clearly indicating the amount and type of pre-approved expenses incurred for Blackhawk to verify the amount and nature of any such expense. Any and all travel expenses shall be subject to Blackhawk's then-current travel and expense policy in effect. A copy of such policy in effect as of the Effective Date is attached herein as Exhibit B.

**6.5    No Payment Obligation.** In the event of any breach or alleged breach of any representations or warranties set forth below, or of any material obligations of Company under this Agreement, Blackhawk's obligation to make any payments under this Agreement shall be terminated, and Blackhawk shall have no further obligation to pay any amount to Company. Termination of such payment obligations shall be in addition to any other rights or remedies that Blackhawk may have in the event of any such breach or alleged breach.

**6.6** **Payment for Cancelled Services.** Blackhawk may, at any time, cancel any aspect of the Services upon written notice to Company. In the event of any such cancellation, Company shall be compensated for any Services rendered and accepted (pursuant to Section 5 above) prior to notice to Company of such cancellation, but any compensation allocated to Services which were yet to be rendered with regard to any cancelled aspect of the Services shall then be eliminated, and Blackhawk shall not be obligated to pay for any such cancelled Services.

**7.** **Protection of Personal Information.** If Company processes private personal information of Blackhawk employees, customers, partners or suppliers under this Agreement or an SOW, in addition to the terms of this Agreement those additional terms included in attached Exhibit C shall govern Company's processing of such information.

**8.** **Insurance.**

**8.1** **Policy Limits.** Without limiting Company's indemnification of Blackhawk as provided herein and as a material condition of this Agreement, the Company shall obtain, pay for, and maintain in full force and effect during the term of this Agreement and for a period of two (2) years, insurance with limits, coverages, terms, and conditions at least as broad as shown below:

(a) Workers' compensation and employers' liability insurance with limits to conform with the greater of the amount required by California law or one million dollars ($1,000,000), with a limit of one million dollars ($1,000,000) per person subject to an aggregate limit of one million dollars ($1,000,000) per annum;

(b) Commercial general liability insurance with limits not less than three million dollars ($3,000,000) combined single limit per occurrence for bodily injury, death, and property damage, including personal injury, contractual liability, independent contractors, broad-form property damage, and products and completed operations coverage. The general aggregate limit shall apply separately to this Agreement or the general aggregate shall be twice the required per occurrence limits; and

(c) Professional Liability Insurance with limits not less than one million dollars ($1,000,000) annual aggregate for all claims each policy year.

**8.2** **Insurance Coverage Requirement.** If Company fails to keep in effect at all times the insurance coverages required under this Section 8, Blackhawk may, in addition to and cumulative with any other remedies available at law, equity, or hereunder, withhold payments to Company required under this Agreement in an amount sufficient to procure the insurance required herein.

**8.3** **Certificate of Insurance.** Upon written request by Blackhawk, Company will provide to Blackhawk policy extracts and policy form numbers to clarify an insurance certificate or as otherwise needed in the course of Blackhawk's business activities. Company shall cause the forgoing policies to name Blackhawk as an additional insured and shall provide for thirty (30) days' prior written notice to Blackhawk in the event of cancellation, lapse, material change or expiration of each such policy. Upon the request of Blackhawk, Company will furnish Blackhawk with a certificate of insurance evidencing the insurance required hereunder.

**9.** **Confidentiality.**

**9.1** **Confidential Information.** Company acknowledges and agrees that pursuant to this Agreement, Company and its Personnel may have access to confidential and proprietary information and materials belonging to Blackhawk, whether disclosed electronically, orally, in writing, or by display which is not generally disclosed to or known by public, concerning or pertaining to the business of Blackhawk (**"Confidential Information"**), including, without limitation, trade secrets, data, reports, methods, techniques, procedures, designs, formulas, processes, methodologies, forecasts, development, technical, manufacturing and marketing plans, employees, partners, customers, suppliers, and/or projects, and that such information is commercially valuable to Blackhawk or is otherwise confidential and proprietary to Blackhawk.

**9.2** **Ownership.** Company agrees that nothing in this Agreement grants to Company any license, right, title or interest in or to the Confidential Information, except as expressly set forth herein. Blackhawk reserves all rights to Confidential Information not expressly granted in this Agreement.

**9.3** **Permitted Use.** Company agrees and acknowledges that Blackhawk's sole purpose in disclosing Confidential Information to Company or

allowing Company access to such information is to aid Company in performing the Services hereunder. Company agrees to use Confidential Information solely for the purposes of the applicable SOW and pursuant to the terms of this Agreement and for no other purpose whatsoever. Company agrees that Company and each of its Personnel and subcontractors will receive and hold such information in the strictest confidence. Company shall use its best efforts to protect the confidentiality of Confidential Information but in no event any less care than that Company takes to protect its own confidential information, and will cause others to protect such information no less that to the extent set forth here. Company agrees to provide Blackhawk with such further assurances as requested by Blackhawk from time to time.

**9.4      Restrictions.** Company further agrees that, without the prior written consent of Blackhawk, Company shall not disclose to third parties or otherwise use except in accordance with the terms of this Agreement, any information obtained from or through Blackhawk in connection with this Agreement, unless (a) the information is rightfully known to Company prior to obtaining the same from Blackhawk; (b) the information is, at the time of disclosure to Company, then in the public domain; or (c) the information is obtained by Company from a third party who did not receive the same, directly or indirectly, from Blackhawk.

**9.5      Obligations after Expiration or Termination.** Upon Blackhawk's written request or upon expiration or termination of this Agreement for any reason, Company will promptly:

(a) return or destroy, at Blackhawk's option, all originals and copies of all documents and materials it has received containing Confidential Information;

(b) deliver or destroy, at Blackhawk's option, all originals and copies of all summaries, records, descriptions, modifications, negatives, drawings, adoptions and other documents or materials, whether in writing or in machine-readable form, prepared by Company or prepared under its direction or at its request from the documents and materials referred to in Section 9.5(a), and

(c) promptly either will return to Blackhawk all materials, in whatever form, and copies thereof containing any Confidential Information or will destroy such materials; and in

the event that such materials are to be destroyed, Company will provide Blackhawk with a certification of such destruction signed by an authorized representative of Company.

**9.6      Existing Obligations.** This Section 9 supplements and does not supersede any written confidentiality or nondisclosure agreement existing between the parties.

**10.      Representations and Warranties.**

**10.1      Representations and Warranties.** Company represents and warrants that:

(a) Services performed and Deliverables provided will meet or exceed the requirements stated in the applicable SOW and this Agreement;

(b) Company shall only assign Personnel who are competent and qualified to perform Services and deliver Deliverables hereunder;

(c) Company shall perform any and all Services in a timely and workmanlike manner with due diligence and in full compliance with the terms of this Agreement and the applicable SOW and the highest professional standard of one skilled in the industry;

(d) Deliverables shall be free from defects in design, material, and workmanship and shall conform to the requirements and/or specifications set forth in the applicable SOW for a period of one (1) year from the respective Acceptance Date, or Company's standard warranty for such Deliverables, whichever affords a longer warranty period to Blackhawk;

(e) Company shall, at its sole expense, promptly correct any defective or non-conforming Services performed or Deliverables provided by Company as set forth in this Agreement;

(f) Except as agreed otherwise by the parties in writing, the Deliverables will be original to, or duly licensed by, the Company and free and clear of any and all liens and encumbrances whatsoever;

(g) Deliverables will not infringe any privacy, Intellectual Property, or other proprietary rights of any third party;

(h) Company has not previously granted and will not grant any rights in the Deliverables to any third party that are inconsistent with the rights granted to Blackhawk herein;

(i) Company has full power and authority to enter into this Agreement, to carry out its obligations under this Agreement and to grant the rights granted to Blackhawk hereunder;

(j) Prior to performing Services, Company's Personnel and subcontractors will have signed an agreement with Company with terms substantially similar to Section 9 (Confidentiality) and Section 11 (Intellectual Property Rights) herein, including assigning ownership of all Intellectual Property and other proprietary rights in the Deliverables to Blackhawk, and subcontractors will also have signed an agreement with Company with terms substantially similar to Section 8 (Insurance);

(k) Company has no outstanding agreement or obligation that is in conflict with any of the provisions of this Agreement, or that would preclude Company from complying with the provisions hereof, and will not enter into any such conflicting agreement during the term of this Agreement;

(l) Company will comply with all applicable state and federal laws, rules and regulations, including, but not limited to, labor, employment, safety and security laws and regulations and policies of Blackhawk;

(m) Company, at its own expense, shall obtain and maintain any and all bonds, permits, licenses, and other documentation and clearances necessary to fulfill its obligations under this Agreement and the applicable SOW; and

(n) Company shall use commercially reasonable measures to screen all software provided or made available by it to Blackhawk hereunder to avoid introducing any virus or other computer software routine or hardware components that are designed (i) to permit unauthorized access or use by third parties to the software installed on Blackhawk's equipment, (ii) to disable or damage hardware or damage, erase or delay access to software or data installed on Blackhawk's equipment, or (iii) to perform any other similar actions. Company shall not insert into any software used by it hereunder or delivered as part of the Deliverables, any code or other device that would have the effect of disabling, damaging,

erasing, delaying or otherwise shutting down all or any portion of the Services or the hardware, software or data used in performing the Services or any of the Deliverables. Company shall not invoke such code or other device at any time, including upon expiration or termination of this Agreement for any reason.

**10.2** **_Nonconforming Services and/or Deliverables._** If Company is unable to promptly repair or replace the nonconforming Deliverable, or re-perform the nonconforming Services, then, without limiting any obligation or liability Company may have with respect to the nonconforming Services or Deliverables, and without limiting any rights and remedies Blackhawk may otherwise have at law, in equity or under this Agreement, upon Blackhawk's request, Company shall promptly refund any and all amounts paid by Blackhawk for such nonconforming Services and/or Deliverables. In addition, Blackhawk may obtain from another source substitute Services or Deliverables that meet the warranties and that are functionally similar to the Services and Deliverables, as applicable, and, upon submission of an invoice, Company shall pay the cost of cover incurred by Blackhawk for such substitute Services or Deliverables.

**10.3** **_Disclaimer._** EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT, THERE ARE NO OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, OR MERCHANTABILITY.

**11.** **Intellectual Property Rights.**

**11.1** **_Definitions._** For the purposes of this Agreement:

(a) "**_Intellectual Property_**" means any patents, patent rights, copyrights, trade secrets, trademarks, trade names, service marks and other intellectual property embodied therein and all applications and rights to apply for registration or protection rights pertaining thereto.

(b) "**_Moral Rights_**" means any right to claim authorship of a work, any right to object to any distortion or other modifications of a work, and any similar right, existing under the law of any country, or under any treaty.

(c) "**_Preexisting Intellectual Property_**" means all Intellectual Property (including

said rights thereto) that such party owned prior to the commencement of the Services.

**11.2** *Company Rights.* As between Blackhawk and Company, Company is deemed to own (i) Company's Preexisting Intellectual Property and any modifications, derivatives, or improvements it makes thereto; and (ii) any new Intellectual Property it creates independent of its performing the Services or delivering the Deliverables that, in case of both (i) and (ii) above: (a) do not contain Blackhawk Preexisting Intellectual Property or Blackhawk Intellectual Property or any derivative works thereof; or (b) do not use, include or refer to Confidential Information of Blackhawk.

**11.3** *License Grant.* As between Blackhawk and Company, Blackhawk owns (i) Blackhawk's Preexisting Intellectual Property, and any modifications, derivatives, or improvements made thereto; and (ii) any new Intellectual Property created in connection with the Services and/or Deliverables. In the event Company's Intellectual Property and/or Preexisting Intellectual Property is incorporated into the Deliverables or is necessary for Blackhawk to utilize the Deliverables, Company hereby grants to Blackhawk a royalty-free, irrevocable, worldwide, nonexclusive, perpetual right and license (with rights of sub-license and assignment) to make, sell, use, disclose, reproduce, modify, distribute (internally and externally), perform, display and create derivative works of Company's Intellectual Property and/or Preexisting Intellectual Property and the right to authorize others to do any of the foregoing, to the extent incorporated into the Deliverables.

**11.4** *Rights to Deliverables.* Except as provided in Section 11.2, the parties agree that all Intellectual Property in the Deliverables or that results from the Services or Deliverables provided by Company and its Personnel under this Agreement or any SOW shall be the sole and exclusive property of Blackhawk and shall be "works made for hire." If by operation of law any such Intellectual Property is not considered a "work made for hire" or is not owned by Blackhawk automatically upon creation thereof, Company agrees to assign and hereby irrevocably assigns, for good and valuable consideration, all right, title, and interest in and to such Intellectual Property exclusively to Blackhawk. Company will document such assignment to Blackhawk and will assist Blackhawk, at Blackhawk's expense, to secure and perfect for Blackhawk's own benefit all Intellectual Property

rights in any and all countries, including granting herein a power of attorney to Blackhawk for the limited purpose of allowing Blackhawk to secure and perfect such an assignment should Company be unable or incapable of doing so itself.

**11.5** *Limited Rights.* During the term of the applicable SOW, Blackhawk grants Company a nonexclusive, nontransferable right to utilize Blackhawk Preexisting Intellectual Property and Blackhawk Intellectual Property solely to the extent necessary for Company to perform Services and deliver Deliverables under this Agreement, and for no other purpose.

**11.6** *Reservation of Rights.* Except as expressly set forth herein, Company understands and agrees that no license, right, title or interest in any Blackhawk Preexisting Intellectual Property or Blackhawk Intellectual Property is granted hereunder and Company will not gain by virtue of this Agreement any rights of ownership in any Intellectual Property or Preexisting Intellectual Property owned by Blackhawk. Company shall not make, have made, sell, offer to sell, use, disclose, reproduce, distribute, perform, display, modify, copy or create derivative works of any Blackhawk Preexisting Intellectual Property or Blackhawk Intellectual Property in any form or forum without Blackhawk's prior written consent. Blackhawk reserves all rights not expressly granted in this Agreement.

**11.7** *Moral Rights.* Company hereby forever waives and agrees never to assert against Blackhawk, its successors or licensees any and all Moral Rights Company may have in any of the Deliverables, and any elements thereof, created, performed, contributed or prepared by Company pursuant to this Agreement, and any results or proceeds therefrom, even after expiration or termination of this Agreement, to the extent permitted by the applicable laws. The foregoing waiver of Moral Rights in the Company Intellectual Property shall be limited to Blackhawk's use of the Company Intellectual Property as permitted hereunder.

**12.** *Limitation of Liability.* TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, AND EXCEPT FOR DAMAGES ARISING UNDER GROSS NEGLIGENCE, WILLFUL MISCONDUCT, FRAUD, OR UNDER INDEMNIFICATION, OR CONFIDENTIALITY SECTIONS, NEITHER

PARTY SHALL BE LIABLE TO THE OTHER FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, INCLUDING BUT NOT LIMITED TO LOST BUSINESS OR LOST PROFITS, OR COSTS OF PROCURING SUBSTITUTE GOODS OR SERVICES, HOWEVER ARISING, EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

### 13. Indemnification.

**13.1 General Indemnification.** Company agrees to defend, indemnify, and hold Blackhawk harmless from and against any and all damages, losses, liabilities, costs and expenses (including without limitation, litigation costs and reasonable attorneys' fees) incurred by Blackhawk as a result of any claim, judgment or proceeding against Blackhawk: (a) allegedly related to, arising out of or in connection with the Services and/or Deliverables hereunder; or (b) by reason of any breach or alleged breach or failure of any of the covenants, representations, warranties, or obligations of Company under this Agreement. Blackhawk will promptly notify Company of any such claim, judgment or proceeding in writing and allow Company the opportunity to settle such claim, judgment or proceeding at Company's sole expense, provided Company shall obtain Blackhawk's written consent prior to entering into any such settlement.

**13.2 Intellectual Property Indemnification.** If any Deliverable or Service hereunder becomes the subject of an infringement claim under Section 13.1 or in Blackhawk's opinion is likely to become the subject of such a claim, then, in addition to its indemnification obligations set forth in Section 13.1, Company shall, at its option and in its sole discretion, either (a) immediately replace or modify the Deliverable or otherwise perform the Services, providing not less than the functionalities specified in the applicable SOW to make it non-infringing or cure any claimed misuse of that third party Intellectual Property right or (b) immediately procure for Blackhawk the right to continue using the Deliverable pursuant to this Agreement. Any costs Blackhawk may incur in connection with implementing either of the above alternatives will be borne by Company. If Company fails to provide one of the foregoing remedies within forty-five (45) days of notice of the claim, Company shall refund to Blackhawk all sums paid by Blackhawk for such infringing Deliverable or Service.

### 14. Remedies.

**14.1 Injunctive Relief.** Company acknowledges and agrees that a breach of any term of Sections entitled "Confidentiality" or "Intellectual Property Rights" will cause irreparable harm to Blackhawk for which monetary damages will not be an adequate remedy, and, therefore, Blackhawk shall be entitled to seek injunctive relief in addition to any remedies it may have hereunder or in law.

**14.2 Self Help.** If Company fails to perform its obligations under this Agreement and any SOW, (a) Company shall provide any and all necessary assistance in connection with the transfer of any partially completed Services and/or Deliverables to Blackhawk or to a third party designated by Blackhawk; and (b) Blackhawk may, at its sole discretion, request Company to: (i) refund any amounts already paid for such Services and/or Deliverables, or (ii) offset amounts owed by Blackhawk to Company for Services or Deliverables thereafter completed by Blackhawk employees or third parties, or (iii) pay the difference between (x) the amount Blackhawk had to pay to obtain the Services and complete the Deliverables, whether Blackhawk does so itself or hires a third party to do so and (y) the amount otherwise were to be payable to Company for such Services and Deliverables. These damages shall be considered direct damages and in no way shall be construed as a penalty.

**14.3 Withhold Remedy.** In addition to, and cumulative to all other remedies in law, at equity and provided under this Agreement, in the event Company is in material default of its duties or obligations under this Agreement and it fails to cure the default within thirty (30) days after receipt of written notice of default from Blackhawk, Blackhawk may, without waiving any other rights under this Agreement, elect to withhold from the payments due to Company under this Agreement during the period beginning with the 16th day after Company's receipt of notice of default, and ending on the date that the default has been cured to the reasonable satisfaction of Blackhawk, an amount that is in proportion to the magnitude of the default or the service that Company is not providing, as determined in Blackhawk's reasonable discretion. Upon curing of the default by Company, Blackhawk will cause the withheld payments to be paid to Company, without interest.

**14.4 Remedies Not Exclusive.** The remedies in this Agreement shall not be exclusive of

any other remedy either party may have against the other party at any time, and shall not limit either party's ability to seek other remedies available under law or in equity. Remedies shall be cumulative and there shall be no obligation to exercise a particular remedy.

### 15. Term and Termination.

**15.1 Term.** This Agreement will commence as of the Effective Date or the date Company has commenced providing services to Blackhawk, whichever is earlier, and will remain in effect for a period of two (2) years, until terminated in accordance with the terms of this Agreement. Notwithstanding the foregoing, Blackhawk may extend the term for additional one (1) year periods by providing written notice to Company at least thirty (30) days prior to the expiration of the then current term. The commencement and termination dates for SOW(s) will be as provided in each applicable SOW.

**15.2 Termination for Cause.** This Agreement shall terminate automatically upon the bankruptcy or insolvency of either party, or the sale of the business of Company. If either party materially defaults in the performance of any of its obligations under this Agreement, which default (a) if of a non-monetary nature, is not substantially cured within thirty (30) days after written notice is given to the defaulting party specifying the default, or (b) if of a monetary nature and there is no dispute about the invoice or the work or the expense with respect to which an invoice has been issued, is not cured within twenty (20) days after notice is given to the defaulting party specifying the default, the party not in default may, by giving written notice thereof to the defaulting party, terminate the applicable SOW with respect to which there is a default, as of a date specified in such notice of termination. For the purpose of this Section 15.2, material breach of this Agreement shall include, but not be limited to, the destruction of Blackhawk property, breach of Section 9 (Confidentiality), breach of Section 11 (Intellectual Property Rights), dishonesty or theft, or failure to abide by the terms of this Agreement and/or perform the Services as set forth in the applicable SOW. In the event of any breach by Company of its material obligations under an SOW, Blackhawk's obligation to make any payments yet to be made under such SOW shall be terminated. Termination of such payment obligations shall be in addition to any other rights or remedies that

Blackhawk may have in the event of any such breach or alleged breach.

**15.3 Termination for Convenience.** Either Blackhawk or Company may terminate this Agreement or any SOW immediately upon sixty (60) days written notice to the other party without reason, penalty or breach of this Agreement, notwithstanding that the Company is in compliance with all delivery, performance or payment requirements. In the event of any such termination, Company shall be compensated for any Services rendered prior to notice to Company but any compensation allocated to Services that were yet to be rendered with regard to any canceled aspect of the Services shall then be eliminated, and the total amount set forth in the applicable SOW ("**Contract Sum**") shall be reduced accordingly.

**15.4 Obligations upon Termination.** Upon termination of this Agreement or of an SOW and subject to the terms of this Agreement, unless otherwise specified by Blackhawk in writing:

(a) Company shall cease to perform the Services under the applicable SOW, and Blackhawk will pay to Company all sums due to Company or Services performed and accepted (as provided in Section 5.2 (Acceptance Testing) and expenses incurred through the effective date of such expiration or termination (prorated as appropriate).

(b) Expiration or termination of this Agreement for any reason will not release either party from any liabilities or obligations set forth in this Agreement which (i) the parties have expressly agreed in writing to survive any such expiration or termination or (ii) remain to be performed or by their nature would be intended to be applicable following any such expiration or termination.

(c) In the case of termination of the Agreement, all SOWs that have not been completed shall be deemed canceled as of the effective date of such termination.

**15.5 Surviving Terms.** Sections 4, 7, 8.1, 9, 10, 11, 12, 13, 14, 15.4, 15.5, 16, 17, 18, 20, and 21 shall survive any termination or expiration of this Agreement.

### 16. Arbitration. 
Company and Blackhawk agree to settle by binding arbitration any dispute or controversy between Company and Blackhawk and/or any of Blackhawk's officers, employees, directors or agents which in any way arises out of or relates to this Agreement, the Services performed by

Company hereunder or the relationship between Company and Blackhawk. Such arbitration shall be conducted in San Francisco, California by the American Arbitration Association under the Commercial Arbitration Rules then in effect. Either Company or Blackhawk may initiate arbitration by serving or mailing a written notice to the other. Any award entered by the arbitrator(s) shall be final and judgment thereon may be entered in any court having jurisdiction.

**17.    Publicity Restrictions**. During the term and at all times after the termination or expiration of this Agreement, Company shall not make any media release or other public announcement relating to or referring to this Agreement without Blackhawk's prior written consent. Company shall acquire no right to use, and shall not use, without Blackhawk's prior written consent any artwork, designs, trade names, copyrighted materials, trademarks or service marks of Blackhawk: (a) in any advertising, publicity, press release, client list, presentation or promotion; (b) to express or to imply any endorsement of Company or Company's services; or (c) in any manner other than expressly in accordance with this Agreement.

**18.    Records.** Company shall properly maintain and retain any and all contracts, notes, documents, agreements, copies, files, records, correspondences, books, accounts, invoices, and other documentation relating to the Services and/or Deliverables ("***Records***"). During the term of this Agreement and for a period of three (3) years after expiration or termination thereof, Company shall, upon reasonable notice by Blackhawk, make Records available for Blackhawk's and its accountants and/or auditors inspection. Company agrees to cooperate with Blackhawk in conducting such audits (and assist in the examination of the Records at no additional charge) and Blackhawk agrees to schedule such audits during Company's normal business hours. If it is determined in the course of the audit that Company owes any amounts to Blackhawk, Company shall refund such amounts to Blackhawk within fifteen (15) days of Blackhawk's request therefor and if any such audit discloses an overcharge of ten percent (10%) or more, Company will pay all costs associated with the audit.

**19.    Limited Background Check.** Company agrees that Blackhawk has the right to require Company to submit to and hereby authorizes Blackhawk to conduct a reference, fingerprint or other criminal background investigation with respect

to regulatory and other legal considerations of Blackhawk or its affiliates, provided, however, that nothing in this Section 19 shall be construed as an obligation or duty to perform such an investigation. Company also acknowledges and agrees that at Blackhawk's request, Company will require the same of any of its subcontractors who perform services related to the performance of Company's obligations under this Agreement.

**20.    Notices.** All notices required by or permitted to be given under this Agreement will be in writing and will be deemed to have been duly given if and when:    (i) delivered personally; (ii) mailed by first class certified mail, return receipt requested, postage prepaid; or (iii) sent by a nationally recognized express courier service, postage or delivery charges prepaid; and in all events will be deemed given upon receipt. All notices will be sent to the applicable party's Representative as set forth below:

If to Blackhawk:

Blackhawk Network, Inc.
5918 Stoneridge Mall Road
Pleasanton, CA 94588-3229
Attn: Steve Silverstein
Facsimile: (925) 226-9083
CC: Legal Department

If to Continental Logistics
Solutions, Inc. 11697 West
Grand Avenue Northlake,
IL 60164
Attn: Sharon Dalenberg
Facsimile: 708-345-8290

Notices shall be deemed received on the earliest of personal delivery, upon twenty-four (24) hours following deposit with a bonded courier or overnight delivery company; or seventy-two (72) hours following deposit in the U.S. Mail as required herein; and in all events will be deemed given upon actual receipt.

**21.    General.**

***21.1    Exhibits and Addenda.*** All exhibits and addenda which are referenced herein and appended hereto, or are signed by the parties on or after the date of this Agreement, are hereby incorporated by reference. Unless expressly stated in the applicable exhibit or addenda, in the event of any conflict between the terms of this Agreement and any exhibit or addenda, the terms and conditions of this Agreement shall govern and prevail.

**21.2   Assignment.** Company may not assign this Agreement, or any obligation contained herein, in whole or in part, buy operation of law or otherwise, without the prior written consent of Blackhawk. Any such attempted assignment shall be null and void.

**21.3   Waivers.** All waivers hereunder must be made in writing, and failure at any time to require the other party's performance of any obligation under this Agreement shall not affect the right subsequently to require performance of that obligation.

**21.4   Governing Law.** The interpretation and enforcement of this Agreement shall be governed by the laws of the State of California, without the conflict of law principles. Exclusive jurisdiction and venue of any action arising out of, relating to, or in connection with this Agreement, its negotiation or termination, or Services provided or to be provided by Company, shall be in San Francisco County, California.

**21.5   Severability.** If any provision of this Agreement is held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court of competent jurisdiction finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed written, construed, and enforced as limited.

**21.6   Agreement Drafted By All Parties.** This Agreement is the result of arm's length negotiations between the parties and shall be construed to have been drafted by all parties such that any ambiguities in this Agreement shall not be construed against either party.

**21.7   Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and will become effective and binding upon the parties as of the Effective Date at such time as all the signatories hereto have signed a counterpart of this Agreement.

**21.8   Headings.** The various section headings of this Agreement are inserted only for convenience of reference and are not intended, nor shall they be construed to modify, define, limit, or expand the intent of the parties as expressed in this Agreement.

**21.9   Entire Agreement.** This Agreement is the entire agreement between the parties with respect to the Services and Deliverables, and supersedes any and all prior negotiations, representations and agreements, whether written or oral, between the parties with respect to the subject matter hereof. Each party acknowledges that no representations, inducements, promises or agreements, orally or otherwise have been made by any party. No other agreement, statement or promise not contained in this Agreement, and no changes or modifications to this Agreement, will be effective unless it is in writing and signed by authorized representatives of both parties.

IN WITNESS WHEREOF, the authorized representatives of the parties have executed this Agreement to become effective as of the Effective Date.


**BLACKHAWK NETWORK, INC.**


By: _____
         Signature
_____
Name and Title

Date: _____


**CONTINENTAL LOGISTICS SOLUTIONS, INC.**

By: _Shawn Dalenberg_____
         Signature
_Sharon Dalenberg   President_____
Name and Title

Date: _9/26/14_____

**EXHIBIT A**

**STATEMENT OF WORK**

This Statement of Work ("**SOW**") effective as of _____, 20__ ("**SOW Effective Date**"), is a part of and incorporated into the Master Services Agreement ("**Agreement**") between Blackhawk Network, Inc. ("**Blackhawk**") and _____ ("**Company**"), dated _____, 20__.

Capitalized terms not defined in this SOW are as defined in the Agreement. In the event of any conflict between the Agreement and this SOW, the terms of the Agreement shall govern.

1. **Contacts.**

   Company Representative: _____
   Address: _____
   _____
   _____
   Telephone number: _____
   Fax number: _____
   Email address: _____

   Blackhawk Representative: _____
   Address: _____
   _____
   _____
   _____
   Telephone number: _____
   Fax number: _____
   Email address: _____

2. **Start Date**: _____

   Choose one:  (a) Fixed Completion Date: _____
   (b) Estimated Completion Date: _____

3. **Services to be Performed; Schedule of Deliverables/Milestones; Specifications; Due Dates:**

   _____
   _____
   _____
   _____

   *For multiple resources, see Schedule 1.*

4. **Payment terms**:

   *A.* ***Contract Sum***:

   The total amount payable under this Agreement shall not exceed $_____ ("**Contract Sum**").

   *B.* ***Payment schedule***: Choose 1, 2 or 3:

   (1) _____Blackhawk will pay for the Services in an amount not to exceed the Contract Sum:

   Check one:  (  )  at a rate of $_____per hour, or

   (  )  in accordance with the rate schedule attached,

   (2) _____ Upon completion of the Services by Company and Acceptance by Blackhawk, Blackhawk will pay Company the Contract Sum.

(3) _____ Upon completion and Acceptance of the Deliverables/Milestones as set forth in Section 3 above, Blackhawk will pay Company in accordance with the schedule attached, not to exceed the Contract Sum.

**C.** *Reimbursable Expenses*: Blackhawk will reimburse Company solely for the documented Reimbursable Expenses approved in advance by Blackhawk and incurred in accordance with the attached Travel and Expense Policy. All Reimbursable Expenses shall be included in, and not in addition to, the Contract Sum.

**D.** *Invoices*: Invoices must be submitted to the address below. Blackhawk will provide Company with a Purchase Order or contract control number ("**Order Number**") for invoicing under this Agreement. Company agrees that it will provide the Order Number on each invoice and that no invoice will be considered validly submitted under this Agreement without such Order Number. Whenever a Purchase Order is issued by Blackhawk as provided herein, the parties agree that any such issuance is for convenience of the issuer and the terms and conditions of any such Purchase Order are superseded by this Agreement.

**5.** **Third Party Intellectual Property.** Company shall identify all third party Intellectual Property, if any, used, embedded or otherwise included in any and all Deliverables as listed on an attachment to this SOW. Choose one of the following:

_____Deliverable(s) include third party Intellectual Property

_____Deliverable(s) do(es) not include third party Intellectual Property

IN WITNESS WHEREOF, the authorized representatives of the parties have executed this SOW to become effective as of the SOW Effective Date.

[**COMPANY**]                                      **BLACKHAWK NETWORK, INC.**

Signature                                                Signature

Printed Name                                         Printed Name

Title                                                        Title

Date                                                        Date

## SCHEDULE 1

Description of services:

| NAME OF PERSON | TITLE | HOURLY BILLABLE RATE ($ USD) |
|---|---|---|
| | | |

**EXHIBIT B**

**TRAVEL AND EXPENSE POLICY / INVOICING REQUIREMENTS & PROCESS**

**1.  Travel and Expense Policy.**

*1.1*    All travel expenses incurred by Contractor must be paid for by Contractor directly. Contractor shall not invoice Blackhawk and Blackhawk shall not be obligated to pay for time spent while in transit.  At no time shall any travel or other expenses exceed the maximum allowances designated herein or be billed directly to a Blackhawk account.  When Contractor invoices Blackhawk for authorized travel expenses, all supporting itemized receipts must be attached to the corresponding invoice and be in compliance with the policy outlined below.  Summary-level credit card receipts without itemized details are not sufficient for reimbursement.  Failure to submit invoices that comply with Blackhawk's Travel Policy will result in delays and/or non-payment of the travel reimbursement.

*1.2*    *Air Travel and Reservations.*

(a)  All travel must be approved, in advance, by the applicable Blackhawk Project Manager, Project Director, or Vice President.

(b)  Any Airline Ticket over $400 submitted for reimbursement to Blackhawk must be supported by an email authorization from a Blackhawk Vice-President.

(c)  Unless there is a valid, Blackhawk-approved reason for changing an airline ticket after the reservation is made, Blackhawk will not reimburse for ticket change fees.

(d)  No travel shall be charged directly to Blackhawk's account, at any time.

*1.3*    *Hotels.*

(a)  Contractor will use Blackhawk approved hotels in the area that they are traveling to. A listing of approved hotels near Blackhawk offices will be provided upon request.  The use of lavish, expensive hotels is not allowed and Blackhawk will not pay for those charges.

(b)  All hotel stays must be based on (1) obtaining the lowest possible room rate and (2) the proximity of the hotel to the facility where the work on behalf of Blackhawk will take place. No considerations should be made for "Hotel Frequent Guest" Programs unless that promotion provides the lowest possible rate.

(c)  All travelers must review their itinerary for the confirmed room rate and compare this to the rate given at time of check-in.

(d)  Blackhawk will not pay for entertainment such as movies or other incidentals.

(e)  The use of discount rate calling cards or similar low-cost options is strongly encouraged whenever making phone calls away from the office. Blackhawk will only reimburse reasonable phone calls that are made for business purposes while on business travel.

*1.4*    *Meals.*

(a)  Blackhawk limits the amount of meals to be submitted for reimbursement to no more than $25 USD per day and require detailed receipts for substantiation.  These charges are subject to review and approval by a Blackhawk Vice-President prior to payment.

(b)  Each individual must pay for his/her own meals.  No reimbursements will be made for meals of other individuals submitted on the same expense report.

(c)  At no time will Blackhawk reimburse for alcoholic beverages.

*1.5*    *Rental Cars.*

(a)  Always request the smallest size of car that is appropriate for your needs.  Generally, a Compact class of vehicle will suffice.

(b)  Blackhawk does not pay for "Prepaid Fueling Options".  Care and planning should always be taken to properly refill the vehicle at a nearby gas station to avoid paying excessive amounts for refueling by the rental car company. With a supporting receipt, Blackhawk will reimburse for the cost of the fuel purchased at gas stations while traveling.

(c)  Blackhawk does not pay for parking tickets and/or moving violations received by the Renter while traveling.

**1.6**     *Mileage Reimbursement.*

(a) Blackhawk will reimburse approved mileage for use of personal vehicles at the prevailing IRS rate.

(b) Travel to/from Contractor's office to the local Blackhawk facility where the assignment is based will not be reimbursed by Blackhawk unless specifically agreed to by Blackhawk.

**2.   Invoicing Requirements & Process.**
Contractor must follow these invoicing requirements and processes when submitting Professional Services invoices to Blackhawk for payment. Failure to follow the procedure outlined below will result in lengthy delays and non-payment of the invoice until required documentation is provided without liability to Blackhawk.

**2.1**     All invoices must reference this Agreement and the applicable SOW.

**2.2**     Purchase Order: All invoices must have an authorized Purchase Order number referenced on the invoice.  Purchase Orders will be issued to Contractor by Blackhawk's IT/HR for each SOW.

**2.3**     A Blackhawk-approved timesheet will be provided at the commencement of an engagement and each week assigned consultants will provide a completed timesheet and activity report to the Blackhawk Project Manager.  The timesheet and/or activity report will include the items enumerated in Section 2.4 below.

**2.4**     Approved Timesheets: All invoices must have a Blackhawk approved Timesheet attached to the invoice as supporting detail for services performed.  The Blackhawk Project Manager to whom the contractor is reporting during his/her assignment must sign all timesheets.  This timesheet must include:

- Contractor name
- Name of Contractor employee
- Dates of work performed
- Breakdown of hours worked, by day (Sunday through Saturday week)
- Description of work performed
- Signature of Contractor employee
- Signature of Blackhawk approving Project Manager

**2.5** Timesheets must be approved by a Blackhawk employee, specifically the Blackhawk Project Manager.  Under no circumstances will approval by non- Blackhawk personnel be acceptable.

**2.6**     Blackhawk Approved Travel Expenses & Supporting Documentation: All Contractor Travel must be approved in advance by Blackhawk in accordance with the Blackhawk Contractor Travel Policy that is made part of the Agreement.  Adherence to the policy includes obtaining required pre-travel authorization from Blackhawk, providing all supporting receipts and documentation for actual expenses incurred, and attaching these supporting documents to the appropriate invoice.

**2.7**     Expense reports must be approved by a Blackhawk employee, specifically the Blackhawk Project Manager.  Under no circumstances will approval by non- Blackhawk personnel be acceptable.

**2.8**     Invoice Bill-To Address: All Blackhawk Information Technology Contractor/Consultant invoices and supporting documentation must be sent to:

Blackhawk Network, Inc.
Attn: Accounts Payable
5918 Stoneridge Mall Road
Pleasanton, CA 94588

## EXHIBIT C

### PERSONAL INFORMATION PROCESSING TERMS AND CONDITIONS

The provisions of this Exhibit C sets forth the understanding between Blackhawk and Company in relation to Personal Information Processing by Company under the Agreement and the applicable SOW, and shall include both manual and automatic processing. In the event of any conflict between the Agreement and/or an SOW, and this Exhibit C, the terms of this Exhibit C will govern.

**1. Definitions.** Capitalized terms not otherwise defined in this Exhibit will have the meanings described in the Agreement. For the purposes of this Exhibit C:

*1.1* "*Data Controller*" shall mean any person who (either alone or jointly or in common with others) determines the purposes for which, and the manner in which, Personal Information is or to be processed.

*1.2* "*Data Processor*" shall mean any person (other than an employee of the Data Controller) who collects, records, organizes or processes the Personal Information.

*1.3* "*Personal Information*" shall mean all information, recorded or not, about an identifiable individual and as otherwise defined in Privacy Laws which has been provided by Blackhawk to Company or otherwise obtained by Company from Blackhawk.

*1.4* "*Personal Information Processing*" shall mean any operation or set of operations which is performed upon Personal Information, whether or not by automatic means, such as collection, recording, organization, storage, adaptation or alteration, retrieval, consultation, use, disclosure by transmission, dissemination or otherwise making available, alignment or combination, blocking, erasure or destruction.

*1.5* "*Privacy Laws*" shall mean all applicable laws, rules, and regulations to which the Company is required to, or has voluntarily agreed to, comply relating to the protection of Personal Information.

**2. Parties' Relationship.** Company understands and acknowledges that under certain Privacy Laws, Data Controllers (which, in the context of the Agreement, is Blackhawk) are obligated to impose

certain obligations of security in relation to the Personal Information upon their Data Processors (which in the context of the Agreement, is the Company). Company will have access to and shall process Personal Information for the purpose of performing its obligations under the Agreement and the applicable SOW. Without limiting other provisions of this Exhibit, at no time shall the Company access, use, or disclose any Personal Information unless it is necessary to perform its obligations under the Agreement and the applicable SOW, and only in accordance with the terms of the Agreement and this Exhibit C.

**3. Representations and Warranties.** Company agrees, covenants, represents and warrants that:

*3.1* It understands the responsibilities and obligations of a Data Processor and has the expertise and capacity to undertake such obligations and responsibilities;

*3.2* It shall take, at its sole expense, all appropriate technical and organizational measures: (i) against accidental loss, destruction or damage to, or unlawful disclosure of the Personal Information; (ii) to secure the confidentiality of the Personal Information; and (iii) to prevent unauthorized or unlawful processing of Personal Information;

*3.3* It will, upon written request from Blackhawk from time to time, inform Blackhawk of the security measures it has taken and will at its own cost implement any further steps that are necessary to ensure data security.

*3.4* It shall not transfer any Personal Information to anywhere where such transfer violates any laws or regulations in relation thereto;

*3.5* All Personal Information provided shall be kept confidential pursuant to the confidentiality provisions of the Agreement;

*3.6* It shall use Personal Information solely for the purpose for which it was provided and only in accordance with the lawful instructions of Blackhawk;

*3.7* It shall not use the Personal Information, whether in combination with other

Information or otherwise, for its own purposes or the benefit of others;

*3.8* It shall comply with all applicable laws and legislation, including without limitation, Privacy Laws, in relation to Personal Information protection;

*3.9* It shall keep Personal Information only for so long as is essential for the purposes of the Agreement and the applicable SOW, and as required or limited by laws in the applicable territory;

*3.10* Upon Blackhawk's request, it shall transfer any and all Personal Information to Blackhawk, or otherwise, shall cooperate with Blackhawk in transferring such Information to another party;

*3.11* It shall not sell, rent, display, distribute, or otherwise make available any Personal Information to any other party without the prior written consent of Blackhawk;

*3.12* It shall use adequate technology and well-defined operational practices to help ensure that Personal Information is processed promptly, accurately, and in confidence;

*3.13* If it becomes aware of a security breach, or a failure to strictly comply with Privacy Laws or instructions from Blackhawk relating to Personal Information, Company shall immediately notify Blackhawk in writing;

*3.14* It shall take all reasonable steps, at its own expense, to remedy the breach or violation that arises from Company's acts or omissions;

*3.15* It shall immediately notify Blackhawk if it receives any legal or regulatory action related to Personal Information and agrees to cooperate with Blackhawk in investigating and responding to any complaint or inquiry relating to Personal Information; and

*3.16* It shall, upon request, promptly assist Blackhawk in disclosing to the subject of Personal Information what it does with such Information and will provide details of Personal Information, as may be required by the applicable law.

**4. Audit Rights.** Pursuant to Section entitled "Records" in the Agreement, Blackhawk shall have the right to conduct audits of the Company's policies, procedures and practices relating to the collection, use, storage, protection and/or disclosure of Personal Information to ensure compliance with the Agreement, Privacy Laws and any third party privacy agreements.

**5. Destruction of Personal Information.** Upon expiration or termination of the Agreement, the Company shall return all Personal Information to Blackhawk and to the extent that such Personal Information is stored electronically, after such Personal Information is transmitted to Blackhawk the Company agrees to certify (by a senior officer of the Company) that such Personal Information has been destroyed.

**6. Confidential Information.** For the purposes of this Exhibit C, Personal Information shall be deemed to be Blackhawk Confidential Information and be subject to the terms of the Confidentiality section of the Agreement. The rights and obligations contained in this Exhibit shall survive any expiration or termination of the Agreement, or any assignment, transfer, conveyance, other disposition or forfeiture of rights thereunder.

# EXHIBIT 2



### STATEMENT OF WORK

This Statement of Work ("**SOW**") effective as of February 23, 2017 ("**SOW Effective Date**"), is a part of and incorporated into the Master Services Agreement ("**Agreement**") between Blackhawk Network, Inc. ("**Blackhawk**") and Continental Logistics Solutions ("**Company**"), dated October 1, 2013.

Capitalized terms not defined in this SOW are as defined in the Agreement. In the event of any conflict between the Agreement and this SOW, the terms of the Agreement shall govern.

1.  **Contacts.**

| | |
|---|---|
| Company Representative: | Robert Morton |
| Address: | 11697 West Grand Avenue |
| | Northlake, IL 60164 |
| Telephone number: | (708) 356-4061 |
| Fax number: | (708) 223-1192 |
| Email address: | rmorton@ctlglobalsolutions.com |
| | |
| Blackhawk Representative: | Richard Curd |
| Address: | 5918 Stoneridge Mall Road |
| | Pleasanton, CA 94588 |
| Telephone number: | (763) 234-5923 |
| Email address: | richard.curd@bhnetwork.com |

2.  **Start Date**: February, 28, 2017

Choose one:   (a) Fixed Completion Date: _____
(b) Estimated Completion Date: February 28, 2020

3.  **Services to be Performed; Schedule of Deliverables/Milestones; Specifications; Due Dates:**

Temporary exchange kiosk storage and shipping as needed. Inventory management, pick and ship of kiosk spare parts to support exchange kiosk field service calls / repairs as needed.
*For multiple resources, see Schedule 1.*

4.  **Payment terms**:

   A.  *Contract Sum*:

The total amount payable under this Agreement shall not exceed $100,000.00 ("**Contract Sum**").

   B.  *Payment schedule*: Choose 1, 2 or 3:

   (1)    __X_ Blackhawk will pay for the Services in an amount not to exceed the Contract Sum:

Check one:   ( )   at a rate of $_____ per hour, or

( X )   in accordance with the rate schedule attached,

   (2)    ____ Upon completion of the Services by Company and Acceptance by Blackhawk, Blackhawk will pay Company the Contract Sum.

   (3)    ____ Upon completion and Acceptance of the Deliverables/Milestones as set forth in Section 3 above, Blackhawk will pay Company in accordance with the schedule attached, not to exceed the Contract Sum.

DocuSign Envelope ID: 3A810C71-1923-4F68-8406-836D5D5BEBD2

**C.** ***Reimbursable Expenses***:  Blackhawk will reimburse Company solely for the documented Reimbursable Expenses approved in advance by Blackhawk and incurred in accordance with the attached Travel and Expense Policy.  All Reimbursable Expenses shall be included in, and not in addition to, the Contract Sum.

**D.** ***Invoices***:  Invoices must be submitted via email to the following as applicable:  Bhn.accountspayable@bhnetwork.com, for all entities other than Achievers or Cardpool; APAchievers@bhnetwork.com for Achievers businesses; or Bhn.cardpoolap@bhnetwork.com for Cardpool; or to physical address (16610 N Black Canyon Highway, Suite B105, Phoenix, AZ 85053).   Blackhawk will provide Company with a Purchase Order or contract control number ("**Order Number**") for invoicing under this Agreement.  Company agrees that it will provide the Order Number on each invoice and that no invoice will be considered validly submitted under this Agreement without such Order Number.  Whenever a Purchase Order is issued by Blackhawk as provided herein, the parties agree that any such issuance is for convenience of the issuer and the terms and conditions of any such Purchase Order are superseded by this Agreement.

**5.** **Third Party Intellectual Property.**  Company shall identify all third party Intellectual Property, if any, used, embedded or otherwise included in any and all Deliverables as listed on an attachment to this SOW.  Choose one of the following:

_____ Deliverable(s) include third party Intellectual Property

_____X_____ Deliverable(s) do(es) not include third party Intellectual Property

IN WITNESS WHEREOF, the authorized representatives of the parties have executed this SOW to become effective as of the SOW Effective Date.

**CONTINENTAL LOGISTICS SOLUTIONS**                          **BLACKHAWK NETWORK, INC.**

*Josh Miller*                                               *Patrick Ramsey*
_____                            _____
Signature                                                  Signature
Josh Miller                                                Patrick Ramsey
_____                            _____
Printed Name                                               Printed Name
Vice President of Business Development                      GM
_____                            _____
Title                                                      Title
3/9/2017                                                   3/10/2017
_____                            _____
Date                                                       Date

# EXHIBIT A

## PRICING SCHEDULE

**BHN Coinstar Rate Card – 2.13.2017**

Addt'l Partnership Value:

Waiver of $2000/per month minimum for fulfillment services (inclusive of storage) b/c of enterprise relationship with BHN

Kiosk storage costs waived for first 30 days at any CTL owned/operated facilities

Ability to image hardware devices locally for improved speed to market/scheduled security updates to master image

| Costs Elements | Details & Assumptions | Pricing Unit | ESTIMATED Projected Units | Standard Cost Per Unit [<12:00PM CST] | Rush Cost Per Unit [>12:01PM CST] | TOTAL (Annual Projection) |
|---|---|---|---|---|---|---|
| **Receiving Operations** | | | | | | |
| LTL (Less than truckload) | Palletized materials, 1 item per pallet, following all receiving requirements: ASN, Packing Slip, Boxes labeled with Sku # and quantity | Pallet | 10 | $ 7.50 | | $ 75.00 |
| Per Case | Inbound cases, 1 item per pallet, following all receiving requirements: ASN, Packing Slip, Boxes labeled with sku # and quantity | Case | 125 | $ 1.50 | | $ 187.50 |
| Mixed Cases | Mixed cases will be treated per item and will be repackaged per item prior to put away | Per Sku | 0 | $ 3.50 | | $ - |
| **Order (Forward) Fulfillment** | | | | | | |
| Order - Manual | Flat file, import into WMS, print of pick ticket | Per Order | 0 | $ 4.50 | $ 7.25 | $ - |
| Order - Integrated | Integrated order system to WMS, print of pick ticket | Per Order | 100 | $ 2.25 | $ 3.60 | $ 225.00 |
| Kiosk | Fulfillment per Kiosk | Per Kiosk | 0 | $ 15.00 | $ 25.00 | $ - |
| Pick - Each | Picking of item, small, non-fragile | Per Each | 300 | $ 0.75 | $ 1.25 | $ 225.00 |
| Pick - Case | Picking of full case, less than 20 lbs | Per Case | 0 | $ 1.50 | $ 2.50 | $ - |
| **Packaging** | | | | | | |
| Packaging Material | Boxes, tape, packing slip, filler, pallet, shrinkwrap, etc | Per Order | 100 | Cost plus 15% | | $ 1,000.00 |
| **Shipping** | | | | | | |
| Shipping | Shipping all orders under CTL shipping accounts, full integration in WMS to include small package, LTL, TL, all ship methods at CTL discounted rates | Per Order | ESTIMATED | | | $ 10,000.00 |
| **Storage Operations** | | | | | | |
| Pallet Storage | Pallets must be standard pallets and not exceed 40" x 48" x 72", per month charge, based on actual space usage the time of invoice | Pallets | 10 | $ 12.50 | | $ 1,500.00 |
| **Order (Reverse) Operations** | | | | | | |
| Return Orders | Per Order: Expected returns | Return | 100 | $ 3.50 | | $ 350.00 |
| Return Items | Per Item: Expected returns | Return | 300 | $ 0.75 | | $ 225.00 |
| **Support Services** | | | | | | |
| Customer Support | This charge includes the day to day account support and assistance of system order flow, processing advanced shipping notifications, consultation, inventory entry, site updates, Client calls, on-going communications, invoicing and quality control needed to keep your fulfillment program accurate, efficient and cost-effective. | Monthly | 12 | $ 250.00 | | $ 3,000.00 |
| **Miscellaneous** | | | | | | |
| Physical Counts | One off requests or annual physical count | Per Hour | 0 | $ 28.00 | | $ - |
| Warehouse labor | Straight time for any special requests | Per Hour | 0 | $ 28.00 | | $ - |
| Custom Reporting | Develop custom reports required by client | Per Hour | 0 | $ 75.00 | | $ - |
| **Implementation** | | | | | | |
| Inventory Transfer | Initial inventory transition, inbound receiving, physical count, box labeling with sku, quantity, setting up bin locations, put away, requires detailed ASN, Packing slip per Pallet, boxes labeled with sku # | Per Hour | 40 | $ 28.00 | | $ 1,120.00 |
| Item Master Set up | Importable file with details for each item; sku #, description, UPC, Lot # if applicable, sellable UOM, weight, dimensions of products sellable units | Per File | 2 | $ 50.00 | | $ 100.00 |
| Initial Portal Setup | Setup: catalog configuration, user roles & permissions, training, etc., full integration with CTL WMS | Platform | 1 | $ 3,800.00 | | $ 3,800.00 |
| Portal - Base Platform | Hosting, Maintenance and Technical Support of OMP | Per Month | 12 | $ 250.00 | | $ 3,000.00 |
| Portal - Administrative Setup (Optional) | Option to have CLS account team set up full catalog to customize product descriptions, tag items, build categories, etc. | Per Hour | 40 | $ 35.00 | | $ 1,400.00 |
| Portal - Administrative Ongoing (Optional) | Ongoing maintenance and updating of order management system by CLS | Per Hour | 0 | $ 35.00 | | $ - |
| Portal - Technical Customization (Optional) | Customization of order management portal, development of a detailed specifications document required for estimate | Per Hour | 0 | $ 150.00 | | $ - |
| | | | | | **TOTAL** | **$ 26,207.50** |

## EXHIBIT B

## STATEMENT OF WORK

1. **Introduction.** COMPANY agrees to provide the following services in the ordinary course of business with Blackhawk and its Affiliates in accordance with the terms and conditions of the Agreement and based on the rates outlined in Exhibit A.

2. **Fulfillment.** COMPANY shall pick Goods from Inventory, place Goods in packages that can protect the integrity of the Goods from damage during shipping, documenting the issue of Goods from Inventory and the completion of the Order once the Goods are delivered to the Carrier for shipping.

3. **Inventory Management.** COMPANY shall have the responsibility of storing, managing and controlling Inventories in accordance with the following:

   a. Properly receiving Inventory to include reconciling all packing slips and Advance Shipping Notification (ASN) quantities with actual quantities received and notifying Blackhawk of all discrepancies

   b. Storing all required Inventories under secure conditions which will prevent damage or theft to the Goods

   c. Properly receiving Inventory and communicating receipt of Inventory to Blackhawk

   d. Inventory received by 2 pm CST that Blackhawk has followed all receiving requirements for will be available to fulfill orders the next business day.

4. **Shipping.** COMPANY will ship orders ("Orders") from the existing inventory ("Inventory") of products (collectively, the "Goods") to residences, business, and all other individuals utilizing the Goods through COMPANY's shipping carriers (the "Carriers") per existing transportation / delivery agreements between COMPANY and any such carriers (the "Carrier Agreements") or any other agreements that COMPANY may substitute for such existing Carrier Agreements.

   a. Blackhawk acknowledges that COMPANY shall have no responsibility for failure of the Carriers to perform in a timely fashion.

   b. Where indicated by the shipping instruction on the order, COMPANY shall ship goods via Carriers using various shipping methods, including but not limited to, standard ground, next day, two days and three day services.

5. **COMPANY Required Performance Levels.** COMPANY shall operate against the following service levels:

   a. Fulfillment:
      i. Ninety-five percent (95%) of orders received in COMPANY approved file format prior to 12 PM Central Standard Time shall be processed for shipment and be ready to be picked up by a designated Carrier within twenty-four business hours.

      ii. COMPANY shall process same day shipments on orders designated as expedited in COMPANY approved file format if received no later than 2 PM Central Standard Time at ninety-nine percent (99%) service level. A rush fee is applicable.

   b. Packaging:

DocuSign Envelope ID: 3A810C71-1923-4C68-8496-836D5D5E5BB2

      iii.   COMPANY shall provide packaging that withstands the stress of shipping and maintains the integrity of the product upon delivery.

      iv.   Packaging shall be secured in a manner to deter tampering or theft.

      v.   COMPANY shall purchase the appropriate packaging materials and invoice the Blackhawk at COMPANY's cost plus mark up at fifteen percent (15%).

c.   Inventory Management:

      i.   COMPANY is responsible for reporting all Inventory shrinkage (missing or unaccounted for inventory) from its receipt of the Inventory to delivery of the Orders packaged for shipment to the Carrier for delivery.  COMPANY will perform an annual physical of Blackhawk inventory at the request of Blackhawk.  An hourly rate would be incurred.

6. **Blackhawk Required Performance Levels.**  Blackhawk shall operate against the following service levels:

a.   Advance Shipping Notification (ASN):

      i.   ASN submitted to COMPANY at least 48 hours prior to inventory arrival. The ASN must include the item number, number of cases to receive, quantity per case, number of pallets, and total of each quantity. Any receipt without this information will be subject to the hourly labor rate and delay receiving time.

b.   Inbound Inventory:

      i.   All inbound shipments must contain Bill of Lading and Packing Slips with detail including number of pallets, number of cases per pallet, Quantities per case, total Quantity on shipment by item number, lot number and expiration date.  Cases must be clearly marked with item number, description and quantity, lot number, expiration date and a scan able bar-code is required. Any inbound shipments without this information will be subject to the hourly labor rate and delay receiving time.

c.   Orders:
      i.   Order files must be in the proper manifest format based on COMPANY-provided template. Any deviations from this format will be subject to the hourly labor rate.

d.   Special Requests:

      i.   Any special requirements must be communicated in detail prior to order arrival for pricing quote. COMPANY will move forward with operation once written approval of pricing quote is provided by Blackhawk.

## TRAVEL AND EXPENSE POLICY / INVOICING REQUIREMENTS & PROCESS

**1.  Company Travel and Expense Policy.**

*1.1*  All travel expenses incurred by Company must be paid for by Company directly. Company shall not invoice Blackhawk and Blackhawk shall not be obligated to pay for time spent while in transit.  At no time shall any travel or other expenses exceed the maximum allowances designated herein or be billed directly to a Blackhawk account.  When Company invoices Blackhawk for authorized travel expenses, all supporting itemized receipts must be attached to the corresponding invoice and be in compliance with the policy outlined below.  Summary-level credit card receipts without itemized details are not sufficient for reimbursement.  Failure to submit invoices that comply with Blackhawk's Travel Policy will result in delays and/or non-payment of the travel reimbursement.

*1.2*  *Air Travel and Reservations.*

(a)  All travel must be approved, in advance, by the applicable Blackhawk Project Manager, Project Director, or Vice President.

(b)  Any Airline Ticket over $400 submitted for reimbursement to Blackhawk must be supported by an email authorization from a Blackhawk Vice-President.

(c)  Unless there is a valid, Blackhawk-approved reason for changing an airline ticket after the reservation is made, Blackhawk will not reimburse for ticket change fees.

(d)  No travel shall be charged directly to Blackhawk's account, at any time.

*1.3*  *Hotels.*

(a)  Company will use Blackhawk approved hotels in the area that they are traveling to.  A listing of approved hotels near Blackhawk offices will be provided upon request.  The use of lavish, expensive hotels is not allowed and Blackhawk will not pay for those charges.

(b)  All hotel stays must be based on (1) obtaining the lowest possible room rate and (2) the proximity of the hotel to the facility where the work on behalf of Blackhawk will take place.  No considerations should be made for "Hotel Frequent Guest" Programs unless that promotion provides the lowest possible rate.

(c)  All travelers must review their itinerary for the confirmed room rate and compare this to the rate given at time of check-in.

(d)  Blackhawk will not pay for entertainment such as movies or other incidentals.

(e)  The use of discount rate calling cards or similar low-cost options is strongly encouraged whenever making phone calls away from the office. Blackhawk will only reimburse reasonable phone calls that are made for business purposes while on business travel.

*1.4*  *Meals.*

(a)  Blackhawk limits the amount of meals to be submitted for reimbursement to no more than $40 USD per day and require detailed receipts for substantiation.  These charges are subject to review and approval by a Blackhawk Vice-President prior to payment.

(b)  Each individual must pay for his/her own meals.  No reimbursements will be made for meals of other individuals submitted on the same expense report.

(c)  At no time will Blackhawk reimburse for alcoholic beverages.

*1.5*  *Rental Cars.*

(a)  Always request the smallest size of car that is appropriate for your needs.  Generally, a Compact class of vehicle will suffice.

(b)  Blackhawk does not pay for "Prepaid Fueling Options".  Care and planning should always be taken to properly refill the vehicle at a nearby gas station to avoid paying excessive amounts for refueling by the rental car company.  With a supporting receipt, Blackhawk will reimburse for the cost of the fuel purchased at gas stations while traveling.

(c)  Blackhawk does not pay for parking tickets and/or moving violations received by the Renter while traveling.

*1.6*  *Mileage Reimbursement.*

(a)  Blackhawk will reimburse approved mileage for use of personal vehicles at the prevailing IRS rate.

(b)  Travel to/from Company's office to the local Blackhawk facility where the assignment is based will not be reimbursed by Blackhawk unless specifically agreed to by Blackhawk.

**2.  Invoicing Requirements & Process.**  Company must follow these invoicing requirements and processes when submitting Professional Services invoices to Blackhawk for payment.  Failure to follow the procedure outlined below will result in lengthy

delays and non-payment of the invoice until required documentation is provided without liability to Blackhawk.

**2.1** All invoices must reference this Agreement and the applicable SOW.

**2.2** Purchase Order: All invoices must have an authorized Purchase Order number referenced on the invoice. Purchase Orders will be issued to Company by Blackhawk Procurement for each SOW.

**2.3** A Blackhawk-approved timesheet will be provided at the commencement of an engagement and each week assigned consultants will provide a completed timesheet and activity report to the Blackhawk Project Manager. The timesheet and/or activity report will include the items enumerated in Section 2.4 below.

**2.4** Approved Timesheets: All invoices must have a Blackhawk approved Timesheet attached to the invoice as supporting detail for services performed. The Blackhawk Project Manager to whom the Company is reporting during his/her assignment must sign all timesheets. This timesheet must include:

- Company name
- Name of Company employee
- Dates of work performed
- Breakdown of hours worked, by day (Sunday through Saturday week)
- Description of work performed
- Signature of Company employee

**2.5** Signature of Blackhawk approving Project Manager A Company-approved timesheet will be provided at the commencement of an engagement and each week assigned consultants will provide a completed timesheet and activity report to the Company Project Manager. The timesheet and/or activity report will include the items enumerated in Section 2.4 above.

**2.6** Approved Timesheets: All invoices must have a Company approved Timesheet attached to the invoice as supporting detail for services performed. The Company Project Manager to whom the Contractor is reporting during his/her assignment must sign all timesheets. This timesheet must include:

- Contractor name
- Name of Contractor employee
- Dates of work performed
- Breakdown of hours worked, by day (Sunday through Saturday week)

- Description of work performed
- Signature of Contractor employee

**2.7** Signature of Company approving Project Manager. Timesheets must be approved by a Company employee, specifically the Company Project Manager. Under no circumstances will approval by non-Company personnel be acceptable.

**2.8** Company Approved Travel Expenses & Supporting Documentation: All Contractor Travel must be approved in advance by Company in accordance with the Company Contractor Travel Policy that is made part of the Agreement. Adherence to the policy includes obtaining required pre-travel authorization from Company, providing all supporting receipts and documentation for actual expenses incurred, and attaching these supporting documents to the appropriate invoice.

**2.9** Expense reports must be approved by a Company employee, specifically the Company Project Manager. Under no circumstances will approval by non-Company personnel be acceptable.

**2.10** Invoice Bill-To Address: All Company Information Technology Contractor/Consultant invoices and supporting documentation must be sent to:

Blackhawk Network, Inc./Cardpool, Inc.
Attn: Accounts Payable

Via email to (as applicable):
- Bhn.accountspayable@bhnetwork.com (for all entities other than Achievers or Cardpool)
- APAchievers@bhnetwork.com (for Achievers businesses)
- Bhn.cardpoolap@bhnetwork.com (for Cardpool)

OR to:
16610 N Black Canyon Highway
Suite B105
Phoenix, AZ 85053

# EXHIBIT 3

**From:** David Jones
**To:** Vassiliki Theros
**Subject:** CardPool Invoices
**Date:** Thursday, February 21, 2019 8:40:33 AM

[EXTERNAL SENDER]

Vaso,

Going forward, please send all CardPool invoices to invoices@cardpool.com

I am in receipt of invoices SI9495684 and SI9495683. Are there any other outstanding invoices?

Also, could you please provide your electronic payment information? Thank you

David Jones

CardPool

m: 214.477.5633

david.jones@cardpool.com

# EXHIBIT 4



Michelle Crocco
Controller
2881 N. Busse Road
Elk Grove Village, IL 60007

O: (708) 223-1159  M: (847) 308-9242
www.ctlglobalsolutions.com

---

**From:** David Jones <david.jones@cardpool.com>
**Sent:** Monday, October 28, 2019 4:07 PM
**To:** Nancy Loague <nloague@ctlglobalsolutions.com>
**Subject:** Re: [Invoices] FW: Statement of Account

[EXTERNAL SENDER]
Nancy,

We are working on pulling together the funds to pay the invoices, we've run into some cash flow issues stemming from a fraud instance that occurred from March through June. We've corrected the issue but it has set us back and we are recovering.  We will get these invoices paid but we would appreciate some patience.

Please discontinue using the BHnetwork email, CardPool has not been part of Blackhawk since January of this year, there is no affiliation between the two companies.  Thank you.

Dave Jones
CardPool
M: 214.477.5633

> On Oct 28, 2019, at 3:39 PM, Nancy Loague <nloague@ctlglobalsolutions.com> wrote:
>
> Hello,
>
> I am following up on the past due invoices I sent last week. Can you update me on the payment status for these invoices?
>
> Please advise,

# EXHIBIT 5

# INVOICE

**Continental Logistics Solutions Inc.**
11697 W Grand Ave.
Northlake, IL 60164

| | |
|---|---|
| Invoice Number | SI9735792 |
| Invoice Date | 8/12/2019 |
| Due Date | 9/11/2019 |
| Our Order No. | |
| P.O. Number | JULY 2019 -PARTS |
| Cust Order No. | |
| Terms | NET 30 |
| Page | 1 |

Bill To

CardPool LLC
Richard Curd
6012 Commerce Drive
Sutie 240
IRVING, TX  75063

| No. | Description | Quantity | Unit Price | Total Price |
|---|---|---|---|---|
| RES-10001 | STORAGE- NON KIOSK | 53 | 12.50 | 662.50 |
| RES-10020 | CUSTOMER SUPPORT | 1 | 250.00 | 250.00 |
| RES-10020 | ORDER FULFILLMENT - INTERGRATED | 15 | 2.50 | 37.50 |
| RES-10020 | ORDER FULFILLMENT - ORDER PICKS | 44 | 0.75 | 33.00 |
| RES-10032 | PACKAGING BOXES & FILLER | 13 | 0.78 | 10.20 |
| RES-10022 | UPS SHIPPING CHARGES | 14 | 12.66 | 177.28 |
| RES-10022 | EXCESS STOCK- SHIMPMENT TO CARDPOOL | 1 | 1140.23 | 1,140.23 |
| RES-10003 | RECEIVING - CASES | 3 | 1.50 | 4.50 |
| RES-10042 | LABOR TO PACKAGE SHIPMNET TO CARDPOOL | 1.5 | 28.00 | 42.00 |
| RES-10020 | SRT - SCAVENGING FEE | 4 | 37.50 | 150.00 |

| | | | |
|---|---|---|---|
| Amount Subject to Sales Tax | 0.00 | **Subtotal** | **2,507.21** |
| Amount Exempt from Sales Tax | 2,507.21 | Invoice Discount | 0.00 |
| | | Total Sales Tax | 0.00 |
| | | **Total** | **2,507.21** |

**A Finance Charge of 2.5% will be assessed if payment is not received on or before the due date listed on the invoice.**

# INVOICE

| | |
|---|---|
| Invoice Number | SI9735793 |
| Invoice Date | 8/12/2019 |
| Due Date | 9/11/2019 |
| Our Order No. | |
| P.O. Number | JULY 2019 - KIOSKS |
| Cust Order No. | |
| Terms | NET 30 |
| Page | 1 |

**Continental Logistics Solutions Inc.**
11697 W Grand Ave.
Northlake, IL 60164

Bill To

CardPool LLC
Richard Curd
6012 Commerce Drive
Sutie 240
IRVING, TX  75063

| No. | Description | Quantity | Unit Price | Total Price |
|---|---|---|---|---|
| RES-10001 | STORAGE PER PALLET KIOSK FLOOR STORED OVERSIZED | 546 | 17.50 | 9,555.00 |
| RES-10003 | RECEIVING KIOSKS | 429 | 7.50 | 3,217.50 |
| RES-10022 | SHIPPING - FOOD LION, MARTINS, GIANT & STOP SHOP | 117 | 423.54 | 49,553.60 |
| RES-10022 | SHIPPING - PROJECT # 2 , SAFEWAY | 321 | 550.86 | 176,826.41 |

| | | | |
|---|---|---|---|
| Amount Subject to Sales Tax | 0.00 | **Subtotal** | 239,152.51 |
| Amount Exempt from Sales Tax | 239,152.51 | Invoice Discount | 0.00 |
| | | Total Sales Tax | 0.00 |
| | | **Total** | **239,152.51** |

**A Finance Charge of 2.5% will be assessed if payment is not received on or before the due date listed on the invoice.**

# INVOICE

**Continental Logistics Solutions Inc.**
11697 W Grand Ave.
Northlake, IL 60164

| | |
|---|---|
| Invoice Number | SI9784221 |
| Invoice Date | 9/12/2019 |
| Due Date | 10/12/2019 |
| Our Order No. | |
| P.O. Number | AUGUST 2019-PARTS |
| Cust Order No. | |
| Terms | NET 30 |
| Page | 1 |

Bill To

CardPool LLC
Richard Curd
6012 Commerce Drive
Sutie 240
IRVING, TX  75063

| No. | Description | Quantity | Unit Price | Total Price |
|---|---|---|---|---|
| RES-10001 | STORAGE- NON KIOSK | 50 | 12.50 | 625.00 |
| RES-10020 | CUSTOMER SUPPORT | 1 | 250.00 | 250.00 |
| RES-10020 | ORDER FULFILLMENT - INTERGRATED | 26 | 2.50 | 65.00 |
| RES-10020 | ORDER FULFILLMENT - ORDER PICKS | 35 | 0.75 | 26.25 |
| RES-10032 | PACKAGING BOXES & FILLER | 19 | 0.91 | 17.29 |
| RES-10022 | UPS SHIPPING CHARGES | 27 | 14.06 | 379.69 |
| RES-10003 | RECEIVING - CASES | 4 | 1.50 | 6.00 |
| RES-10020 | SRT - SCAVENGING FEE | 2 | 37.50 | 75.00 |

| | | | | |
|---|---|---|---|---|
| Amount Subject to Sales Tax | 0.00 | | Subtotal | 1,444.23 |
| Amount Exempt from Sales Tax | 1,444.23 | | Invoice Discount | 0.00 |
| | | | Total Sales Tax | 0.00 |
| | | | **Total** | **1,444.23** |

**A Finance Charge of 2.5% will be assessed if payment is not received on or before the due date listed on the invoice.**

# INVOICE

| | |
|---|---|
| Invoice Number | SI9784222 |
| Invoice Date | 9/12/2019 |
| Due Date | 10/12/2019 |
| Our Order No. | |
| P.O. Number | AUGUST 2019 - KIOSK |
| Cust Order No. | |
| Terms | NET 30 |
| Page | 1 |

**Continental Logistics Solutions Inc.**
11697 W Grand Ave.
Northlake, IL 60164

Bill To

CardPool LLC
Richard Curd
6012 Commerce Drive
Sutie 240
IRVING, TX  75063

| No. | Description | Quantity | Unit Price | Total Price |
|---|---|---|---|---|
| RES-10001 | STORAGE PER PALLET KIOSK FLOOR STORED OVERSIZED | 572 | 17.50 | 10,010.00 |
| RES-10003 | RECEIVING KIOSKS | 26 | 7.50 | 195.00 |
| RES-10022 | SHIPPING - FOOD LION, MARTINS, GIANT & STOP SHOP | 22 | 521.19 | 11,466.14 |

| | | | | |
|---|---|---|---|---|
| Amount Subject to Sales Tax | 0.00 | | **Subtotal** | **21,671.14** |
| Amount Exempt from Sales Tax | 21,671.14 | | Invoice Discount | 0.00 |
| | | | Total Sales Tax | 0.00 |
| | | | **Total** | **21,671.14** |

**A Finance Charge of 2.5% will be assessed if payment is not received on or before the due date listed on the invoice.**



# INVOICE

| | |
|---|---|
| Invoice Number | SI9832012 |
| Invoice Date | 10/16/2019 |
| Due Date | 11/15/2019 |
| Our Order No. | |
| P.O. Number | SEPTEMBER 2019 - PARTS |
| Cust Order No. | |
| Terms | NET 30 |
| Page | 1 |

**Continental Logistics Solutions Inc.**
11697 W Grand Ave.
Northlake, IL 60164

Bill To

CardPool LLC
Richard Curd
6012 Commerce Drive
Sutie 240
IRVING, TX  75063

| No. | Description | Quantity | Unit Price | Total Price |
|---|---|---|---|---|
| RES-10001 | STORAGE- NON KIOSK | 50 | 12.50 | 625.00 |
| RES-10020 | CUSTOMER SUPPORT | 1 | 250.00 | 250.00 |
| RES-10020 | ORDER FULFILLMENT - INTERGRATED | 1 | 2.50 | 2.50 |
| RES-10020 | ORDER FULFILLMENT - ORDER PICKS | 1 | 0.75 | 0.75 |
| RES-10022 | UPS SHIPPING CHARGES | 1 | 9.84 | 9.84 |

| | | | |
|---|---|---|---|
| Amount Subject to Sales Tax | 0.00 | **Subtotal** | **888.09** |
| Amount Exempt from Sales Tax | 888.09 | Invoice Discount | 0.00 |
| | | Total Sales Tax | 0.00 |
| | | **Total** | **888.09** |

**A Finance Charge of 2.5% will be assessed if payment is not received on or before the due date listed on the invoice.**

# INVOICE

| | |
|---|---|
| Invoice Number | SI9832014 |
| Invoice Date | 10/16/2019 |
| Due Date | 11/15/2019 |
| Our Order No. | |
| P.O. Number | SEPTEMBER 2019 - KIOSKS |
| Cust Order No. | |
| Terms | NET 30 |
| Page | 1 |

**Continental Logistics Solutions Inc.**
11697 W Grand Ave.
Northlake, IL 60164

Bill To

CardPool LLC
Richard Curd
6012 Commerce Drive
Sutie 240
IRVING, TX  75063

| No. | Description | Quantity | Unit Price | Total Price |
|---|---|---|---|---|
| RES-10001 | STORAGE PER PALLET KIOSK FLOOR STORED OVERSIZED | 622 | 17.50 | 10,885.00 |
| RES-10003 | RECEIVING KIOSKS | 50 | 7.50 | 375.00 |
| RES-10022 | SHIPPING - FOOD LION, MARTINS, GIANT & STOP SHOP | 62 | 497.71 | 30,857.83 |

| | | | | |
|---|---|---|---|---|
| Amount Subject to Sales Tax | 0.00 | | **Subtotal** | **42,117.83** |
| Amount Exempt from Sales Tax | 42,117.83 | | Invoice Discount | 0.00 |
| | | | Total Sales Tax | 0.00 |
| | | | **Total** | **42,117.83** |

**A Finance Charge of 2.5% will be assessed if payment is not received on or before the due date listed on the invoice.**

# INVOICE

**Continental Logistics Solutions Inc.**
11697 W Grand Ave.
Northlake, IL 60164

| | |
|---|---|
| Invoice Number | SI9868784 |
| Invoice Date | 11/11/2019 |
| Due Date | 12/11/2019 |
| Our Order No. | |
| P.O. Number | OCTOBER 2019 - KIOSKS |
| Cust Order No. | |
| Terms | NET 30 |
| Page | 1 |

Bill To

CardPool LLC
David Jones
6012 Commerce Drive
Sutie 240
IRVING, TX  75063

| No. | Description | Quantity | Unit Price | Total Price |
|---|---|---|---|---|
| RES-10001 | STORAGE PER PALLET KIOSK FLOOR STORED OVERSIZED | 644 | 17.50 | 11,270.00 |
| RES-10003 | RECEIVING KIOSKS | 23 | 7.50 | 172.50 |
| RES-10022 | FREIGHT COST KROGER PICK UPS | 22 | 566.79 | 12,469.37 |

| | | | | |
|---|---|---|---|---|
| Amount Subject to Sales Tax | 0.00 | | **Subtotal** | **23,911.87** |
| Amount Exempt from Sales Tax | 23,911.87 | | Invoice Discount | 0.00 |
| | | | Total Sales Tax | 0.00 |
| | | | **Total** | **23,911.87** |

**A Finance Charge of 2.5% will be assessed if payment is not received on or before the due date listed on the invoice.**

# INVOICE

**Continental Logistics Solutions Inc.**
11697 W Grand Ave.
Northlake, IL 60164

| | |
|---|---|
| Invoice Number | SI9911511 |
| Invoice Date | 12/10/2019 |
| Due Date | 1/9/2020 |
| Our Order No. | |
| P.O. Number | NOVEMBER INVOICE - PARTS |
| Cust Order No. | |
| Terms | NET 30 |
| Page | 1 |

Bill To

CardPool LLC
David Jones
6012 Commerce Drive
Sutie 240
IRVING, TX  75063

| No. | Description | Quantity | Unit Price | Total Price |
|---|---|---|---|---|
| RES-10001 | STORAGE- NON KIOSK | 47 | 12.50 | 587.50 |
| RES-10020 | CUSTOMER SUPPORT | 1 | 250.00 | 250.00 |
| RES-10020 | ORDER FULFILLMENT - INTERGRATED | 3 | 2.50 | 7.50 |
| RES-10020 | ORDER FULFILLMENT - ORDER PICKS | 7 | 0.75 | 5.25 |
| RES-10022 | UPS SHIPPING CHARGES | 2 | 22.02 | 44.03 |

| | | | |
|---|---|---|---|
| Amount Subject to Sales Tax | 0.00 | **Subtotal** | **894.28** |
| Amount Exempt from Sales Tax | 894.28 | Invoice Discount | 0.00 |
| | | Total Sales Tax | 0.00 |
| | | **Total** | **894.28** |

**A Finance Charge of 2.5% will be assessed if payment is not received on or before the due date listed on the invoice.**

# INVOICE

| | |
|---|---|
| Invoice Number | SI9911512 |
| Invoice Date | 12/10/2019 |
| Due Date | 1/9/2020 |
| Our Order No. | |
| P.O. Number | NOVEMBER 2019 - KIOSK |
| Cust Order No. | |
| Terms | NET 30 |
| Page | 1 |

**Continental Logistics Solutions Inc.**
11697 W Grand Ave.
Northlake, IL 60164

Bill To

CardPool LLC
David Jones
6012 Commerce Drive
Sutie 240
IRVING, TX 75063

| No. | Description | Quantity | Unit Price | Total Price |
|---|---|---|---|---|
| RES-10001 | STORAGE PER PALLET KIOSK FLOOR STORED OVERSIZED | 644 | 17.50 | 11,270.00 |

| | | | | |
|---|---|---|---|---|
| Amount Subject to Sales Tax | 0.00 | | **Subtotal** | **11,270.00** |
| Amount Exempt from Sales Tax | 11,270.00 | | Invoice Discount | 0.00 |
| | | | Total Sales Tax | 0.00 |
| | | | **Total** | **11,270.00** |

**A Finance Charge of 2.5% will be assessed if payment is not received on or before the due date listed on the invoice.**

# INVOICE

**Continental Logistics Solutions Inc.**
11697 W Grand Ave.
Northlake, IL 60164

| | |
|---|---|
| Invoice Number | SI9950424 |
| Invoice Date | 1/8/2020 |
| Due Date | 2/7/2020 |
| Our Order No. | |
| P.O. Number | DECEMBER 2019 - PARTS |
| Cust Order No. | |
| Terms | NET 30 |
| Page | 1 |

Bill To

CardPool LLC
David Jones
6012 Commerce Drive
Sutie 240
IRVING, TX  75063

| No. | Description | Quantity | Unit Price | Total Price |
|---|---|---|---|---|
| RES-10001 | STORAGE - NON KIOSKS | 47 | 12.50 | 587.50 |

| | | | | |
|---|---|---|---|---|
| Amount Subject to Sales Tax | 0.00 | | Subtotal | 587.50 |
| Amount Exempt from Sales Tax | 587.50 | | Invoice Discount | 0.00 |
| | | | Total Sales Tax | 0.00 |
| | | | **Total** | **587.50** |

**A Finance Charge of 2.5% will be assessed if payment is not received on or before the due date listed on the invoice.**

# INVOICE

**Continental Logistics Solutions Inc.**
11697 W Grand Ave.
Northlake, IL 60164

| | |
|---|---|
| Invoice Number | SI9950425 |
| Invoice Date | 1/8/2020 |
| Due Date | 2/7/2020 |
| Our Order No. | |
| P.O. Number | DECEMBER 2019 - KIOSKS |
| Cust Order No. | |
| Terms | NET 30 |
| Page | 1 |

Bill To

CardPool LLC
David Jones
6012 Commerce Drive
Sutie 240
IRVING, TX  75063

| No. | Description | Quantity | Unit Price | Total Price |
|---|---|---|---|---|
| RES-10001 | Storage Fee - Unit of Measure | 645 | 17.50 | 11,287.50 |

| | | | | |
|---|---|---|---|---|
| Amount Subject to Sales Tax | 0.00 | | **Subtotal** | **11,287.50** |
| Amount Exempt from Sales Tax | 11,287.50 | | Invoice Discount | 0.00 |
| | | | Total Sales Tax | 0.00 |
| | | | **Total** | **11,287.50** |

**A Finance Charge of 2.5% will be assessed if payment is not received on or before the due date listed on the invoice.**

# EXHIBIT 6

**Aged Accounts Receivable**

Continental Logistics Solutions Inc

Monday, September 21, 2020 10:43 AM

Page

CTL\DLOZANO

(Detail, aged as of September 21, 2020)

Aged by  due date.

Customer: No.: BLACKKIOSK

| No. Due Date | Trx Date | Name Description | Document | | | | Balance Due | Current | Aged Overdue Amounts | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Type | External Doc. No. | PO No. | Number | | | Up To 30 Days | 31 - 60 Days | Over 60 Days | Days Past Due |
| BLACKKIOSK | | CardPool LLC | | | | Phone No. | 214-477-5633 | Contact | David Jones | | | |
| 9/11/19 | 7/31/19 | Invoice SIN038864 | Invoice | | JULY | SI9735792 | 2,507.21 | 0.00 | 0.00 | 0.00 | 2,507.21 | 376 |
| 9/11/19 | 7/31/19 | Invoice SIN038866 | Invoice | | JULY | SI9735793 | 239,152.51 | 0.00 | 0.00 | 0.00 | 239,152.51 | 376 |
| 10/12/19 | 8/31/19 | Invoice SIN040007 | Invoice | | AUGUS | SI9784221 | 1,444.23 | 0.00 | 0.00 | 0.00 | 1,444.23 | 345 |
| 10/12/19 | 8/31/19 | Invoice SIN040500 | Invoice | | AUGUS | SI9784222 | 21,671.14 | 0.00 | 0.00 | 0.00 | 21,671.14 | 345 |
| 11/15/19 | 9/30/19 | Invoice SIN041435 | Invoice | | SEPTEM | SI9832012 | 888.09 | 0.00 | 0.00 | 0.00 | 888.09 | 311 |
| 11/15/19 | 9/30/19 | Invoice SIN041436 | Invoice | | SEPTEM | SI9832014 | 40,117.83 | 0.00 | 0.00 | 0.00 | 40,117.83 | 311 |
| 12/11/19 | 10/31/19 | Invoice SIN042499 | Invoice | | OCTOB | SI9868784 | 23,911.87 | 0.00 | 0.00 | 0.00 | 23,911.87 | 285 |
| 1/9/20 | 11/30/19 | Invoice SIN043940 | Invoice | | NOVEM | SI9911511 | 894.28 | 0.00 | 0.00 | 0.00 | 894.28 | 256 |
| 1/9/20 | 11/30/19 | Invoice SIN043942 | Invoice | | NOVEM | SI9911512 | 11,270.00 | 0.00 | 0.00 | 0.00 | 11,270.00 | 256 |
| 2/7/20 | 12/31/19 | Invoice SIN045133 | Invoice | | DECEM | SI9950424 | 587.50 | 0.00 | 0.00 | 0.00 | 587.50 | 227 |
| 2/7/20 | 12/31/19 | Invoice SIN045134 | Invoice | | DECEM | SI9950425 | 11,287.50 | 0.00 | 0.00 | 0.00 | 11,287.50 | 227 |
| BLACKKIOSK | | Total Amount Due | | | | | 353,732.16 | 0.00 | 0.00 | 0.00 | 353,732.16 | |
| | | | | | | Credit Limit: | No Limit | 0.00% | 0.00% | 0.00% | 100.00% | |

|  | | Report Total Amount Due (USD) | 353,732.16 | 0.00 | 0.00 | 0.00 | 353,732.16 |
|---|---|---|---|---|---|---|---|
| | | | | 0.00% | 0.00% | 0.00% | 100.00% |

# EXHIBIT 7



## RELEASE AGREEMENT

This Release Agreement is made as of this 26th day of August, 2020 ("Effective Date"), by and between Continental Logistics Solutions, Inc., an Illinois corporation having its principal place of business at 2881 N. Busse Road, Elk Grove Village, IL 60007 ("CLS") and Cardpool, a Texas company having its principal place of business at 6012 Campus Circle Dr W. Ste 240, Irving TX 75063 ("Cardpool"). CLS and Cardpool are sometimes referred to as the "Parties".

## RECITALS

WHEREAS, CLS is in the business of warehousing and distribution and Cardpool is their Client.

WHEREAS, Cardpool and CLS have entered into a business relationship in which CLS is storing certain goods and products ("Inventory") in a CLS warehouse and has requested that CLS dispose of such goods and products on Cardpool's behalf.

## AGREEMENT

NOW THEREFORE, in consideration of the covenants and promises herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **Cardpool Inventory.** As of the Effective Date Cardpool and CLS acknowledge and agree that (i) the Inventory being stored by CLS consists of the product and goods described in Exhibit A, (ii) Cardpool has requested that CLS dispose of the Inventory and terminate, as of the Effective Date, any further accrual of storage fees related to the Inventory, (iii) CLS has agreed to destroy or make other disposition of the Inventory in a manner that it deems appropriate at CLS's cost, and, (iv) in consideration of CLS agreeing to destroy or make other disposition of the Inventory at its cost, any salvage value or other benefit ("Salvage Value") that CLS obtains from destroying or otherwise disposing of the Inventory shall accrue to and be for the benefit of CLS. Cardpool hereby represents and warrants that (i) it has full title and ownership in the Inventory, (ii) it has the right to authorize and direct CLS to destroy or otherwise dispose of the Inventory, and, (iii) such destruction or disposition shall not impact the rights of any third party. Cardpool shall indemnify and defend CLS from any costs, claims, damages or expenses (including attorneys' fees) that CLS may incur from Cardpool's breach of the foregoing representation and warranty.

2. **Outstanding Balance.** It is acknowledged and agreed by Cardpool that: (i) as of the Effective Date, there is an outstanding balance in the amount of $353,732.16 (as further described in detail in Exhibit B, the "Outstanding Balance") owed by Cardpool to CLS for services rendered to Cardpool, (ii) CLS's agreement to dispose of the Inventory at its cost in consideration of receipt of any Salvage Value does not impact or in any way reduce or amend Cardpool's obligation to make payment of the Outstanding Balance, together with the amount of any interest that may accrue on the Outstanding Balance until the Outstanding Balance is paid in full.

3. **Representations and Warranties**: Each of the Parties represents and warrants to the other Parties as follows:

    a.    Each of the Parties has the full right and power to execute, deliver and perform this Release Agreement according to its terms, without the necessity of consent of or joinder with another; when executed and delivered, this Release Agreement shall constitute a valid and binding

agreement, enforceable according to its terms and as to all related entities, successors, subsidiaries, affiliates and/or agents and assigns;

b.  No claim or obligation referred to in this Release Agreement has been assigned, transferred, hypothecated, pledged, mortgaged or set over in any manner whatsoever, in whole or in part, to any third person not a party to this Release Agreement and each of the Parties have the sole and exclusive right to release and discharge all of the claims and obligations; and

c.  This Release Agreement is executed and delivered without reliance upon any statement, representation, promise, inducement, understanding or agreement by or on behalf of any Party hereto or by or on behalf of any representative or agent employed by another of the Parties, other than the matters expressly set forth herein.

2.  **Entire Agreement**:  The Parties understand and agree that this Release Agreement is the entire agreement between the Parties with respect to the release of the property.

3.  **Successors and Assigns**:  This Release Agreement shall be binding upon and inure to the benefit of the Parties' respective successors and assigns.

4.  **Governing Law and Venue**:  This Release Agreement shall be governed by the laws of the State of Illinois, excluding its choice of law principles.  Any action to enforce or interpret this Release Agreement shall be brought by motion or action in the exclusive jurisdiction and venue of the Circuit Court of Cook County, Illinois.

AGREED:

Continental Logistics Solutions, Inc.                    Cardpool

By: Josh Miller                                          *David S Jones*
Title: EVP + GM                                          David S Jones (Aug 31, 2020 09.31 CDT)

                                                         By: David S Jones
                                                         Title: CEO

2

## EXHIBIT A (Parts and Kiosks)

| Item No. | Item Description | QTY on Hand | Perfect % |
|---|---|---|---|
| BLA096-20005-01MAG | OLEA GIFT CARD WINGS - set - MAGNETIC | 6 | 1.0 |
| JACKSONBRACKET | JACKSON HONEYWELL 3330G | 207 | 1.0 |
| 255678-BK | BRACKET - MOUNT, ANTENNA, CE, JACKSON | 90 | 0.5 |
| 33SA922A01 | SANKYO ADAPTOR KIT (ICM3301 12V USB) | 5 | 0.5 |
| EXCWOBBLER | KIOSK EXCHANGE WOBBLER | 530 | 0.5 |
| TOPPERCLIPS | KIOSK TOPPER CLIPS | 520 | 0.5 |
| PW101-1203 | PRINTER POWER SUPPLY POWER | 60 | 0.5 |
| 256648 | PC CORE / DISPLAY POWER CABLE | 13 | 0.5 |
| A1UL00179 | CABLE ASSY - USB TYPE A TO JST 6 WAY (500MM) | 21 | 0.5 |
| P1021952-001 | OLEA Printer KR203 Accessory Kit | 3 | 0.5 |
| ZEB-P1077451 | OPTO SENSOR ASSEMBLY | 20 | |
| A1UL00172 | DISPLAY- POWER 2U PPLY | 2 | 0.5 |
| A1UL00164 | CARD READER-SANKYO ICT3K-3R6250 | 4 | 0.5 |
| A1UL00183 | CABLE-3' BLACK VGA W/15PIN D-SHELL MALE TO MALE | 14 | 0.5 |
| 259488-BK | CABLE - HDMI TO DVI, 16FT | 5 | 0.5 |
| BLA096-20005-01MAG | OLEA GIFT CARD WINGS - set - MAGNETIC | 27 | 1.0 |
| 32028278 | KIOSK ROLL PERFORATED | 438 | 1.0 |
| 32028278 | KIOSK ROLL PERFORATED | 70 | 1.0 |
| 32028278 | KIOSK ROLL PERFORATED | 360 | 1.0 |
| 32028278 | KIOSK ROLL PERFORATED | 696 | 1.0 |
| CRS-191336 | HELIOS BK-T630 PRINTER | 6 | 1.0 |
| ES29077 | 27941 27 IN WIDE FHD LCD WVA | 5 | 1.0 |
| 6FTXTNCORD | 6' EXTENTION CORD | 11 | 0.5 |
| TLSURGE6Q6FT | TRIPP LITE 6 OUTLET 6 FT SURGE PROTECTOR | 18 | 0.5 |
| EXCWOBBLER | KIOSK EXCHANGE WOBBLER | 77 | 0.5 |
| CASHWOBBLER | KIOSK CASH SIGN WOBBLER | 577 | 0.5 |
| 255579-BK | CABLE - USB, A MALE TO MINI 5 MALE, 6FT | 6 | 0.5 |
| HE-SCREEN PWR CBL | Helios Screen Power Cable | 7 | 0.5 |
| IBR650PLE-AT | CRADLEPOINT COR | 7 | 0.5 |
| A1UL00013 | Cable - Touchscreen, USB B-A, 6ft | 11 | 0.5 |
| 256647 | FAN TO RS-232-PORT POWER CABLE | 10 | 0.5 |
| A1UL00184 | CABLE-USB TYPE A TO MICRO B RIGHT ANGLE 72 INCH | 8 | 0.5 |
| 256650 | CABLE SANKYO 24V POWER 47INCH | 4 | 0.5 |
| A1UL00183 | CABLE-POWER DIP MSR RS-232 TO 2-PIN | 4 | 0.5 |
| 32028278 | KIOSK ROLL PERFORATED | 384 | 1.0 |
| 32028278 | KIOSK ROLL PERFORATED | 360 | 1.0 |
| 32028278 | KIOSK ROLL PERFORATED | 348 | 1.0 |
| 32028278 | KIOSK ROLL PERFORATED | 383 | 1.0 |
| BLA21865 | RETROFIT BRACKETS - HELIOS | 50 | 1.0 |
| CASHEXCGTKR | KROGER NEW FRONT PANEL LABEL FOR KROGER | 469 | 1.0 |
| KIOSKCLIP | GRIPPER CLIP PLASTIC (SMALL) | 508 | 1.0 |
| BLA096-20005-00 | OLEA GIFT CARD WINGS - RIGHT SIDE | 1 | 0.5 |
| BLA096-20005-01 | OLEA GIFT CARD WINGS - LEFT SIDE | 1 | |
| A1UL00173 | KIOSK- FAN SPEAKERS | 9 | 0.5 |
| 4YH15 | HELIOS PUCK LOCK | 2 | 0.5 |
| 256692-02 | KIT - ROUTER, WIRELESS, IBR650LPE-SP, CO | 10 | 0.5 |
| A1UL00150 | ANTENNA ASSY - LAIRD W/EXTENSION CABLE | 7 | 0.5 |
| KROGERSHEET | NEW INTRUCTION SHEET FOR KROGER KIOSK DISPLAY SETU | 671 | 0.5 |
| JCKSN SCREEN POWER | Jackson Screen Power Cable | 3 | 0.5 |
| DP2VGAZ | DISPLAYPORT TO VGA M/F VIDEO | 20 | 0.5 |
| A1UL00182 | CABLE-IEC A/C 1FT (RGT ANGLE) | 1 | 0.5 |
| USB2SERIALADAPT | USB TO SERIAL ADAPTER | 4 | 0.5 |
| 32018235-BK | KIOSK ROLL | 1 | 0.5 |
| 11040379 | MASTEK MINI PORT POWERED | 3 | 0.5 |
| BLA21865 | RETROFIT BRACKETS - HELIOS | 50 | 1.0 |
| BLA21865 | RETROFIT BRACKETS - HELIOS | 50 | 1.0 |
| BLA21865 | RETROFIT BRACKETS - HELIOS | 50 | 1.0 |
| NANOPARTS | MISC PARTS FOR NANONATION DEPLOYMENT OF KIOSKS | 4 | 1.0 |
| NEWKIOSK | NEW SIGN FOR KROGER KIOSK | 577 | 1.0 |
| RTNSNANO | ITEMS RETURNED FOR NANO TO DETERMINE STATUS | 4 | 1.0 |
| A1UL00162 | WEBCAM - M5 LIFECAM HD-6000 | 3 | 0.5 |
| 33100-4USB-0 | USB KIT 1D,2D PDF417 GREY SCN STRT | 1 | 0.5 |
| 24860-BK | Sankyo ICT3K-3R6290, W/IMP | 3 | 0.5 |
| 9983002191 | RECEIPT PRINTER POWER CABLE | 7 | 0.5 |
| 170584-001 | CRADLEPOINT POWER ADAPTER | 33 | 0.5 |
| 32018235-BK | KIOSK ROLL | 3 | 0.5 |
| 256757-BK | BRACKET - LIFECAM CAMERA | 15 | 0.5 |
| 16051435 | SLIM SEAL USB CABLE | 3 | 0.5 |
| KR403GUIDE | PAPER GUIDE KIT 38MM TTP20COKR2C3 KR403 | 4 | 0.5 |
| 3330G-4USB-0 | Honeywel 3330G KIT, USB cable, 1D/2D | 18 | 0.5 |
| KR203 | Zebra KR203 thermal printer PC | 3 | 3 |
| KR203-USED | Used - Zebra KR203 thermal printer PC | 23 | 0.5 |

3

| Brand Name | Item Description | Qty | Quantity Shipped |
|---|---|---|---|
| HEBAD | HELIOS BAD Kiosk | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEBAD | HELIOS BAD Kiosk | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEBAD | HELIOS BAD Kiosk | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEBAD | HELIOS BAD Kiosk | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HELIOS NANO | HELIOS USED KIOSK - NANO TO LOOK | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEBAD | HELIOS BAD Kiosk | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 4 | 4 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEBAD | HELIOS BAD Kiosk | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 1 | 1 |
| HEBAD | HELIOS BAD Kiosk | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEBAD | HELIOS BAD Kiosk | 1 | 1 |
| HELIOS NANO | HELIOS USED KIOSK - NANO TO LOOK | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 1 | 1 |
| HELIOS NANO | HELIOS USED KIOSK - NANO TO LOOK | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEBAD | HELIOS BAD Kiosk | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEBAD | HELIOS BAD Kiosk | 3 | 3 |
| HEBAD | HELIOS BAD Kiosk | 2 | 2 |

4

| | | | |
|---|---|---|---|
| HELIOS NANO | HELIOS USED KIOSK - NANO TO LOOP | 1 | 1 |
| HEBAD | HELIOS BAD Kiosk | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HELIOS NANO | HELIOS USED KIOSK - NANO TO LOOP | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEBAD | HELIOS BAD Kiosk | 1 | 1 |
| HENEW | KIOSK HELIOS NEW | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 5 | 5 |
| HEBAD | HELIOS BAD Kiosk | 1 | 1 |
| HELIOS NANO | HELIOS USED KIOSK - NANO TO LOOP | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEBAD | HELIOS BAD Kiosk | 3 | 3 |
| HEBAD | HELIOS BAD Kiosk | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 4 | 4 |
| HEBAD | HELIOS BAD Kiosk | 1 | 1 |
| HELIOS NANO | HELIOS USED KIOSK - NANO TO LOOP | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 1 | 1 |
| HEBAD | HELIOS BAD Kiosk | 1 | 1 |
| HELIOS NANO | HELIOS USED KIOSK - NANO TO LOOP | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 1 | 1 |
| HEBAD | HELIOS BAD Kiosk | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HELIOS NANO | HELIOS USED KIOSK - NANO TO LOOP | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEBAD | HELIOS BAD Kiosk | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEBAD | HELIOS BAD Kiosk | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEBAD | HELIOS BAD Kiosk | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEBAD | HELIOS BAD Kiosk | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 1 | 1 |
| HEBAD | HELIOS BAD Kiosk | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |

5

| | | | |
|---|---|---|---|
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEBAD | HELIOS BAD Kiosk | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEBAD | HELIOS BAD Kiosk | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEBAD | HELIOS BAD Kiosk | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 1 | 1 |
| HELIOS NANO | HELIOS USED KIOSK - NANO TO LOOK | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| OLEAGOOD | OLEA GOOD KIOSK | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 5 | 5 |
| HEBAD | HELIOS BAD Kiosk | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 1 | 1 |
| HEBAD | HELIOS BAD Kiosk | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEBAD | HELIOS BAD Kiosk | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEBAD | HELIOS BAD Kiosk | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HELIOS NANO | HELIOS USED KIOSK - NANO TO LOOK | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 1 | 1 |
| HELIOS NANO | HELIOS USED KIOSK - NANO TO LOOK | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 1 | 1 |
| HEBAD | HELIOS BAD Kiosk | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HELIOS NANO | HELIOS USED KIOSK - NANO TO LOOK | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 4 | 4 |
| HEBAD | HELIOS BAD Kiosk | 1 | 1 |
| HELIOS NANO | HELIOS USED KIOSK - NANO TO LOOK | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEBAD | HELIOS BAD Kiosk | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HE-GOOD | HELIOS GOOD | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEBAD | HELIOS BAD Kiosk | 1 | 1 |
| HELIOS NANO | HELIOS USED KIOSK - NANO TO LOOK | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEBAD | HELIOS BAD Kiosk | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 1 | 1 |
| HELIOS NANO | HELIOS USED KIOSK - NANO TO LOOK | 1 | 1 |
| HENEW | KIOSK HELIOS NEW | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |

6

| | | | |
|---|---|---|---|
| HEUSED | KIOSK HEUOS USED | 4 | 4 |
| HEUSED | KIOSK HEUOS USED | 4 | 4 |
| HEUSED | KIOSK HEUOS USED | 4 | 4 |
| HEUSED | KIOSK HEUOS USED | 4 | 4 |
| HEBAD | HEUOS BAD Kiosk | 2 | 2 |
| HELIOS NANO | HEUOS USED KIOSK - NANO TO LOOK | 1 | 1 |
| HENEW | KIOSK HEUOS NEW | 1 | 1 |
| HEBAD | HEUOS BAD Kiosk | 3 | 3 |
| HEUSED | KIOSK HEUOS USED | 4 | 4 |
| HEUSED | KIOSK HEUOS USED | 4 | 4 |
| HEUSED | KIOSK HEUOS USED | 4 | 4 |
| HELIOS NANO | HEUOS USED KIOSK - NANO TO LOOK | 1 | 1 |
| HEUSED | KIOSK HEUOS USED | 3 | 3 |
| HEUSED | KIOSK HEUOS USED | 4 | 4 |
| HEUSED | KIOSK HEUOS USED | 3 | 3 |
| HEUSED | KIOSK HEUOS USED | 3 | 3 |
| HEBAD | HEUOS BAD Kiosk | 1 | 1 |
| HEUSED | KIOSK HEUOS USED | 3 | 3 |
| HEUSED | KIOSK HEUOS USED | 4 | 4 |
| HEUSED | KIOSK HEUOS USED | 4 | 4 |
| HEUSED | KIOSK HEUOS USED | 4 | 4 |
| HEBAD | HEUOS BAD Kiosk | 1 | 1 |
| HEUSED | KIOSK HEUOS USED | 3 | 3 |
| HEUSED | KIOSK HEUOS USED | 4 | 4 |
| HEBAD | HEUOS BAD Kiosk | 1 | 1 |
| HEUSED | KIOSK HEUOS USED | 3 | 3 |
| HEUSED | KIOSK HEUOS USED | 5 | 5 |
| HELIOS NANO | HEUOS USED KIOSK - NANO TO LOOK | 1 | 1 |
| HEUSED | KIOSK HEUOS USED | 3 | 3 |
| HEUSED | KIOSK HEUOS USED | 4 | 4 |
| HEBAD | HEUOS BAD Kiosk | 1 | 1 |
| HELIOS NANO | HEUOS USED KIOSK - NANO TO LOOK | 2 | 2 |
| HEUSED | KIOSK HEUOS USED | 1 | 1 |
| HEBAD | HEUOS BAD Kiosk | 1 | 1 |
| HEUSED | KIOSK HEUOS USED | 3 | 3 |
| HEUSED | KIOSK HEUOS USED | 4 | 4 |
| HEUSED | KIOSK HEUOS USED | 4 | 4 |
| HEUSED | KIOSK HEUOS USED | 4 | 4 |
| HEUSED | KIOSK HEUOS USED | 4 | 4 |
| HEBAD | HEUOS BAD Kiosk | 1 | 1 |
| HELIOS NANO | HEUOS USED KIOSK - NANO TO LOOK | 1 | 1 |
| HEUSED | KIOSK HEUOS USED | 2 | 2 |
| HEBAD | HEUOS BAD Kiosk | 1 | 1 |
| HEUSED | KIOSK HEUOS USED | 3 | 3 |
| HEBAD | HEUOS BAD Kiosk | 1 | 1 |
| HEUSED | KIOSK HEUOS USED | 3 | 3 |
| HEUSED | KIOSK HEUOS USED | 4 | 4 |
| HENEW | KIOSK HEUOS NEW | 1 | 1 |
| HEUSED | KIOSK HEUOS USED | 4 | 4 |
| HEUSED | KIOSK HEUOS USED | 2 | 2 |
| HEUSED | KIOSK HEUOS USED | 2 | 2 |
| HEBAD | HEUOS BAD Kiosk | 1 | 1 |
| HELIOS NANO | HEUOS USED KIOSK - NANO TO LOOK | 1 | 1 |
| HEUSED | KIOSK HEUOS USED | 2 | 2 |
| HEBAD | HEUOS BAD Kiosk | 1 | 1 |
| HEUSED | KIOSK HEUOS USED | 3 | 3 |
| HEUSED | KIOSK HEUOS USED | 4 | 4 |
| HEUSED | KIOSK HEUOS USED | 2 | 2 |
| HEBAD | HEUOS BAD Kiosk | 1 | 1 |
| HEUSED | KIOSK HEUOS USED | 2 | 2 |
| HEBAD | HEUOS BAD Kiosk | 1 | 1 |
| HEUSED | KIOSK HEUOS USED | 2 | 2 |
| HEUSED | KIOSK HEUOS USED | 4 | 4 |
| HEUSED | KIOSK HEUOS USED | 4 | 4 |
| HEUSED | KIOSK HEUOS USED | 3 | 3 |
| HEUSED | KIOSK HEUOS USED | 4 | 4 |
| HEUSED | KIOSK HEUOS USED | 4 | 4 |

7

| | | | |
|---|---|---|---|
| HEUSED | KIOSK HELIOS USED | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HELIOS NANO | HELIOS USED KIOSK - NANO TO LOOK | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEUSED | KIOSK HELIOS USED | 4 | 4 |
| HEBAD | HELIOS BAD Kiosk | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 3 | 3 |
| HEBAD | HELIOS BAD Kiosk | 1 | 1 |
| HELIOS NANO | HELIOS USED KIOSK - NANO TO LOOK | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 2 | 2 |
| HEBAD | HELIOS BAD Kiosk | 2 | 2 |
| HELIOS NANO | HELIOS USED KIOSK - NANO TO LOOK | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 1 | 1 |
| HEUSED | KIOSK HELIOS USED | 1 | 1 |
| HELIOS NANO | HELIOS USED KIOSK - NANO TO LOOK | 3 | 3 |
| HENEW | KIOSK HELIOS NEW | 1 | 1 |
| | | 131 | 131 |

EXHIBIT B

**Aged Accounts Receivable**
Continental Logistics Solutions Inc

Friday, August 21, 2020 12:49 PM
Page
CTL\DLOZANO

(Detail, aged as of August 21, 2020)
Aged by due date.
Customer: No. BLACKKIOSK

| No. Due Date | Trx Date | Name Description | Type | External Doc. No. | PO No. | Number | Balance Due | Current | Up To 30 Days | 31 - 60 Days | Over 60 Days | Days Past Due |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BLACKKIOSK | | CardPool LLC | | | | Phone No | 214-477-5633 | Contact | David Jones | | | |
| 9/11/19 | 7/31/19 | Invoice SIN038864 | Invoice | JULY | | SI9735792 | 2,507.21 | 0.00 | 0.00 | 0.00 | 2,507.21 | 345 |
| 9/11/19 | 7/31/19 | Invoice SIN038866 | Invoice | JULY | | SI9735793 | 239,152.51 | 0.00 | 0.00 | 0.00 | 239,152.51 | 345 |
| 10/12/19 | 8/31/19 | Invoice SIN040007 | Invoice | AUGUS | | SI9784221 | 1,444.23 | 0.00 | 0.00 | 0.00 | 1,444.23 | 314 |
| 10/12/19 | 8/31/19 | Invoice SIN040500 | Invoice | AUGUS | | SI9784222 | 21,671.14 | 0.00 | 0.00 | 0.00 | 21,671.14 | 314 |
| 11/15/19 | 9/30/19 | Invoice SIN041435 | Invoice | SEPTEM | | SI9832012 | 888.09 | 0.00 | 0.00 | 0.00 | 888.09 | 280 |
| 11/15/19 | 9/30/19 | Invoice SIN041436 | Invoice | SEPTEM | | SI9832014 | 40,117.83 | 0.00 | 0.00 | 0.00 | 40,117.83 | 280 |
| 12/11/19 | 10/31/19 | Invoice SIN042499 | Invoice | OCTOB | | SI9868784 | 23,911.87 | 0.00 | 0.00 | 0.00 | 23,911.87 | 254 |
| 1/9/20 | 11/30/19 | Invoice SIN043940 | Invoice | NOVEM | | SI9911511 | 894.28 | 0.00 | 0.00 | 0.00 | 894.28 | 225 |
| 1/9/20 | 11/30/19 | Invoice SIN043942 | Invoice | NOVEM | | SI9911512 | 11,270.00 | 0.00 | 0.00 | 0.00 | 11,270.00 | 225 |
| 2/7/20 | 12/31/19 | Invoice SIN045133 | Invoice | DECEM | | SI9950424 | 587.50 | 0.00 | 0.00 | 0.00 | 587.50 | 196 |
| 2/7/20 | 12/31/19 | Invoice SIN045134 | Invoice | DECEM | | SI9950425 | 11,287.50 | 0.00 | 0.00 | 0.00 | 11,287.50 | 196 |
| BLACKKIOSK | | Total Amount Due | | | | | 353,732.16 | 0.00 | 0.00 | 0.00 | 353,732.16 | |
| | | | | | | Credit Limit: | No Limit | 0.00% | 0.00% | 0.00% | 100.00% | |

| | Report Total Amount Due (USD) | | 353,732.16 | 0.00 | 0.00 | 0.00 | 353,732.16 |
|---|---|---|---|---|---|---|---|
| | | | | 0.00% | 0.00% | 0.00% | 100.00% |

9